[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————————

No. 01-13606

————————————————————

**FILED**

**U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 28, 2003
THOMAS K. KAHN
CLERK**

D. C. Docket No. 99-00042-CV-WLS

WILLIE SANTONIO MANDERS,

Plaintiff-Appellee,

versus

THURMAN LEE, individually and as employee of the
City of Homerville, ALAN BROWN, individually and
as employee of the City of Homerville, BART CREWS,
individually and as employee of the City of
Homerville, CITY OF HOMERVILLE, CLINCH COUNTY, GEORGIA,

Defendants,

WINSTON PETERSON, individually and as employee of
Clinch County, Georgia,

Defendant-Appellant.

————————————————————

Appeal from the United States District Court
for the Middle District of Georgia

————————————————————

**(July 28, 2003)**

Before EDMONDSON, Chief Judge, TJOFLAT, ANDERSON, BIRCH,
DUBINA, BLACK, CARNES, BARKETT, HULL, MARCUS and WILSON,
Circuit Judges.

HULL, Circuit Judge:

In this § 1983 excessive force case, Willie Santonio Manders sued Sheriff Winston Peterson in his official capacity for injuries allegedly caused by the Sheriff's use-of-force policy at the jail and failure to train and discipline his deputies in that regard. We conclude that Sheriff Peterson functions as an "arm of the State" in establishing use-of-force policy at the jail and in training and disciplining his deputies in that regard, and is entitled to Eleventh Amendment immunity for these particular functions. Thus, we reverse the district court's denial of summary judgment for Sheriff Peterson.

## I. BACKGROUND

### A. Facts

As the elected sheriff, defendant Sheriff Peterson is responsible for the operation of the jail in Clinch County, Georgia, for establishing use-of-force policy at the jail, and for hiring, training, and disciplining his deputies who work in the jail. Sheriff Peterson's deputy and chief jailer is Alan Brown. In May 1997, police officers from the City of Homerville arrested plaintiff Manders and transported him to the jail.[1] Because Manders had punched a police officer, the

_____

[1]We recount the evidence in the light most favorable to Manders, the nonmoving party, on a summary judgment motion. Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1277 (11th Cir. 1998).

arresting officers charged him with felony obstruction of an officer, in violation of Georgia law, O.C.G.A. § 16-10-24(b).

As Manders was escorted into the jail's holding cell, a City police officer stated that Manders "hit him" earlier. According to Manders, Deputy Brown and a City police officer then repeatedly struck him across the head, neck, and face and banged his head against a wall. Manders suffered a bruised, swollen face. The beating affected him emotionally, resulting in a mental hospital stay.

The morning after the beating, Manders wrote a statement for jail officials, wherein he stated: "They had to be rough with me to let me know that they mean business." That same day, Manders was released from jail. Afterwards, Manders's mother met with Sheriff Peterson to discuss the beating. According to Manders's mother, Sheriff Peterson responded to her concerns this way: "[T]hat happens sometimes when they bite and scratch." Sheriff Peterson did not investigate the beating incident. In his deposition, Manders later testified that Sheriff Peterson and another officer forced him to write his statement.

Manders's evidence also included the Policy and Procedure Manual (the "Manual") of the Sheriff's Office containing the Sheriff's use-of-force policy. Sheriff Peterson published the Manual in 1989 or 1990, drafting some policies

himself and adopting some State policies. The Manual requires that "[e]ach case involving physical or defensive force be reported in writing to the Sheriff:"[2]

(A)    Notification of Supervisor

1.    The Sheriff shall be immediately informed of each incident involving the use of force by officers of this Department. Such notification shall be on the same date of the incident.

2.    Each case involving physical or defensive force shall be reported in writing to the Sheriff.

3.    Each officer present or assisting in an arrest or incident requiring force shall be prepared to submit a report supplement describing the incident if requested.

In addition to the report requirement, the Manual discusses both non-deadly and deadly force by an officer in the performance of his duties. The Manual provides that non-deadly force may be used by an officer in these situations:

1.    When necessary to preserve the peace, prevent commission of offenses, or prevent suicide or self-inflicted injury.

2.    When preventing or interrupting a crime or attempted crime against property.

3.    When making lawful arrests and searches, overcoming resistance to such arrest and searches, and preventing escapes from custody.

4.    When in self defense, or defense of another against unlawful violence to his person.

The Manual also details when deadly force is justified. Sheriff Peterson has no other written or standard operating procedures for the use of force at the jail.

**B.    Amended Complaint**

---

[2]Deputy Brown never submitted a written report indicating he used force with Manders. Sheriff Peterson never required Brown to do so even after having met with Manders's mother.

In this § 1983 case, Manders's amended complaint claims that defendants Clinch County and Sheriff Peterson, in his official capacity, are responsible for use-of-force policy at the jail, for training and disciplining deputies who work at the jail, and for ensuring that the policy is followed.[3] According to Manders, Deputy Brown beat him, and Clinch County and Sheriff Peterson permitted Brown's use of excessive force at the jail. Manders also asserts that Clinch County and Sheriff Peterson failed to provide deputies proper training and supervision regarding use of force at the jail and failed to promulgate adequate rules to regulate deputies' conduct at the jail. Manders asserts that these failures caused his beating. Manders sought damages against Clinch County and Sheriff Peterson in his official capacity.[4]

The district court denied defendants' motion for summary judgment on Manders's § 1983 damage claims against Clinch County and Sheriff Peterson in his official capacity for the use-of-force policy at the jail and the training and

---

[3]The parties and the district court litigated this lawsuit against Sheriff Peterson as if all of Manders's § 1983 claims against Clinch County also were made against Sheriff Peterson in his official capacity. Thus, we decide the case as one in which the amended complaint purports to sue Sheriff Peterson in his official capacity for use-of-force policy and for failing to train and discipline Deputy Brown in that regard. See Marsh v. Butler County, 268 F.3d 1014, 1023-24 n.4 (11th Cir. 2001) (en banc).

[4]At no time has Manders made a claim against Sheriff Peterson's official bond, which Georgia law requires sheriffs to post, O.C.G.A. § 15-16-5, and we do not address such a claim.

disciplining of deputies in that regard.[5]  Sheriff Peterson alone filed this interlocutory appeal, claiming that he is a state actor and that the district court erred in denying him Eleventh Amendment immunity.[6]  This appeal does not address the <u>individual</u> liability of Sheriff Peterson or his deputies for using excessive force.[7]  Instead, this appeal involves only the immunity of Sheriff Peterson in his <u>official</u> capacity.

## II.  THE ELEVENTH AMENDMENT

---

[5]The district court granted summary judgment (1) to Sheriff Peterson individually on all claims, (2) to Clinch County and Sheriff Peterson in his official capacity on Manders's § 1983 claim for the negligent hiring of Deputy Brown, and (3) to Clinch County and Sheriff Peterson on Manders's injunctive relief claims.  Manders did not appeal or cross-appeal these rulings.

[6]Although Clinch County also asserts that Sheriff Peterson acts for the State and is not a county policymaker, Clinch County did not appeal because it could not at this time.  When a county appeals asserting that a sheriff is not a county policymaker under § 1983, that presents a defense to liability issue for the county over which we do not have interlocutory jurisdiction. <u>Swint v. Chambers County Comm'n</u>, 514 U.S. 35, 43 (1995).  In contrast, when a sheriff in his official capacity appeals interlocutorily asserting Eleventh Amendment immunity, this presents a threshold immunity-from-suit issue over which we have jurisdiction. <u>See</u> <u>P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.</u>, 506 U.S. 139, 147 (1993); <u>Swint</u>, 514 U.S. at 42-43; <u>Grech v. Clayton County</u>, __ F.3d __ (11th Cir. 2003) (<u>en banc</u>).

[7]It is argued that the majority opinion "badly subverts the law," makes sheriffs "immune from suit," and renders a "substantial blow" to citizens being able to hold officials accountable for constitutional violations. (Dissent, Barkett, J., pp. 56, 88).  As noted above, this case involves only the sheriff "<u>in his official capacity</u>" and does not affect in any way claims against sheriffs or their deputies in their individual capacities. <u>See</u> <u>Hafer v. Melo</u>, 502 U.S. 21, 30-31 (1991) ("[T]he Eleventh Amendment does not erect a barrier against suits to impose 'individual and personal liability' on state officials under § 1983."); <u>Hobbs v. Roberts</u>, 999 F.2d 1526, 1528 (11th Cir. 1993) (noting that Eleventh Amendment immunity does not extend to "'individual' or 'personal' capacity suits in federal court"); <u>Gamble v. Fla. Dep't of Health & Rehabilitative Servs.</u>, 779 F.2d 1509, 1512-13 (11th Cir. 1986) ("[T]he Eleventh Amendment provides no bar to federal court adjudication of suits against state officers individually.").

6

## A. Immunity from Suit in Federal Court

The Eleventh Amendment provides immunity by restricting federal courts' judicial power:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. The Eleventh Amendment protects a State from being sued in federal court without the State's consent.[8] As a result, parties with claims against a non-consenting State must resort to the State's own courts. The Eleventh Amendment is "a recognition that states, though part of a union, retain attributes of sovereignty, including immunity from being compelled to appear in the courts of another sovereign against their will." McClendon v. Georgia Dep't of Cmty. Health, 261 F.3d 1252, 1256 (11th Cir. 2001).

It is also well-settled that Eleventh Amendment immunity bars suits brought in federal court when the State itself is sued and when an "arm of the State" is sued. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977). To receive Eleventh Amendment immunity, a defendant need not be

---

[8]"Although the express language of the [Eleventh] [A]mendment does not bar suits against a state by its own citizens, the Supreme Court has held that an unconsenting state is immune from lawsuits brought in federal court by the state's own citizens." Carr v. City of Florence, 916 F.2d 1521, 1524 (11th Cir. 1990) (citing Hans v. Louisiana, 134 U.S. 1 (1890)). "[I]n the absence of consent[,] a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984).

labeled a "state officer" or "state official," but instead need only be acting as an "arm of the State," which includes agents and instrumentalities of the State. See Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 429-30 (1997). Whether a defendant is an "arm of the State" must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise. See Shands Teaching Hosp. & Clinics v. Beech St. Corp., 208 F.3d 1308, 1311 (11th Cir. 2000) ("The pertinent inquiry is not into the nature of [an entity's] status in the abstract, but its function or role in a particular context."). The particular functions at issue are Sheriff Peterson's force policy at the jail and the training and disciplining of his deputies in that regard.[9]

## B. Eleventh Amendment Factors

In Eleventh Amendment cases, this Court uses four factors to determine

---

[9]See Tuveson v. Fla. Governor's Council of Indian Affairs, Inc., 734 F.2d 730,734 (11th Cir. 1984) (noting "the functions of the Council" are significant to Eleventh Amendment analysis); cf. McMillian v. Monroe County, 520 U.S. 781, 785-86 (1997) (instructing that the question is not whether the sheriff acts for the county or state "in some categorical, 'all or nothing' manner[;]" rather the question of whether the sheriff acts for the county or state requires attention to the sheriff's role "in a particular area, or on a particular issue"); Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 45 (1994) (noting "Port Authority functions are not readily classified as typically state or unquestionably local").

Although the majority opinion focuses only on the particular function of Sheriff Peterson in establishing force policy at the jail and training and disciplining his deputies, the dissent criticizes this functional approach and defines the Sheriff's conduct at a higher level of abstraction with "jail operation as the pertinent function." (Dissent, Barkett, J., p. 65). We disagree because the dissent's characterization of the function at issue is too broad; the relevant question is not whether Sheriff Peterson acts for the State or Clinch County in some categorical all or nothing manner in connection with the county jail. Instead, the proper inquiry is whether Sheriff Peterson acts for the State or Clinch County in the particular functions at issue today.

8

whether an entity is an "arm of the State" in carrying out a particular function: (1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity. <u>Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm.</u>, 226 F.3d 1226, 1231-34 (11th Cir. 2000); <u>Shands</u>, 208 F.3d at 1311; <u>Tuveson v. Fla. Governor's Council of Indian Affairs, Inc.</u>, 734 F.2d 730, 732 (11th Cir. 1984).

Given these factors, the resolution of the Eleventh Amendment issue in this case depends, in part, on state law. Therefore, before applying the four-factor test, we must examine Georgia law and the relationship between Sheriff Peterson, the State, and Clinch County. The issue of whether an entity is an "arm of the State" for Eleventh Amendment purposes is ultimately a question of federal law. But the federal question can be answered only after considering provisions of state law. Thus, we now journey through Georgia's legal terrain at some length.[10]

### III. GEORGIA LAW

---

[10]We focus on Georgia law, as opposed to how other circuits treat sheriffs under other states' laws, because states have extremely wide latitude in determining their forms of government and how state functions are performed, and because significant for our case is how the Georgia Supreme Court has treated sheriffs in Georgia and interpreted the provisions of Georgia law in issue. See <u>Regents of the Univ. of Cal. v. Doe</u>, 519 U.S. 425, 429 n.5 (1997) (noting that the Eleventh Amendment question "can be answered only after considering the provisions of state law that define the agency's character"); <u>Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 280 (1977) (stating that whether an entity is entitled to Eleventh Amendment immunity "depends, at least in part, upon the nature of the entity created by state law").

We first examine the governmental structure of Sheriff Peterson's office vis-à-vis the State and Clinch County under Georgia law. Next, we outline the functions Sheriff Peterson performs as they reflect the character of his office. Then we apply the Eleventh Amendment factors to the sheriff's functions in issue: promulgating force policy and training and disciplining deputies in that regard.

## A. Georgia's Governmental Structure

Georgia's Constitution has created the sheriff's office as an elected constitutional office in Georgia's governmental hierarchy. Ga. Const. art. IX, § 1, ¶ 1. The sheriff's office is not a division or subunit of Clinch County or its county governing body, and, thus, it is not a structural part of Clinch County government. See id.; Ga. Const. art. IX, § 2, ¶ 1(c)(1). Rather, the sheriff's office is a separate constitutional office independent from Clinch County and its governing body. See Ga. Const. art. IX, § 2, ¶ 1(c)(1).

Further, Georgia's Constitution grants the State legislature the exclusive authority to establish and to control a sheriff's powers and duties. Ga. Const. art. IX, § 1, ¶ 3(a)-(b).[11] Interpreting this constitutional provision, the Georgia

---

[11]Georgia's Constitution provides that sheriffs "shall be elected by the qualified voters of their respective counties for terms of four years and shall have such qualifications, powers, and duties as provided by general law." Ga. Const. art. IX, § 1, ¶ 3(a). That paragraph also provides that the "[c]ounty officers . . . may be on a fee basis, salary basis, or fee basis supplemented by salary," but that "[m]inimum compensation for said county officers may be established by the General Assembly by general law" and supplemented by local law or "if such authority is delegated by local law, by action of the county governing authority." Ga. Const. art. IX, § 1, ¶ 3(b); see infra note 12. The State legislature thus also controls sheriffs' qualifications and minimum salary.

Supreme Court has explained that sheriffs are subject to the control of the Georgia legislature and are <u>not</u> county employees. <u>Bd. of Comm'rs of Randolph County v. Wilson</u>, 260 Ga. 482, 482 (1990) ("The sheriff . . . is an elected, constitutional officer; he is subject to the charge of the General Assembly and is not an employee of the county commission."); see <u>Chaffin v. Calhoun</u>, 262 Ga. 202, 203 (1992); <u>Warren v. Walton</u>, 231 Ga. 495, 499-500 (1973).

In contrast to the State's authority and control over sheriffs, Georgia's Constitution grants counties no legislative power or authority over sheriffs and expressly prevents counties from controlling or affecting the sheriff's office or the personnel thereof.[12] Ga. Const. art. IX, § 2, ¶ 1(c)(1). In this regard, the Georgia Supreme Court has concluded that this constitutional restriction on the legislative power granted to counties–home rule–prevents counties from taking action affecting the sheriff's office. <u>Warren</u>, 231 Ga. at 499;[13] see <u>Stephenson v. Bd. of Comm'rs of Cobb County</u>, 261 Ga. 399, 401-02 (1991). As a result, counties

---

[12]Georgia's Constitution provides that the legislative "power granted to counties . . . shall not be construed to extend to . . . [a]ction affecting any elective county office, the salaries thereof, or the personnel thereof, except the personnel subject to the jurisdiction of the county governing authority." Ga. Const. art. IX, § 2, ¶ 1(c)(1). The Georgia Attorney General has stated that, under Georgia's Constitution, county governing authorities lack even the authority to supplement the sheriff's salary "unless authorized by local law enacted by the General Assembly to supplement the salary." Ga. Op. Atty. Gen. No. U97-19 (1997); see <u>infra</u> note 36.

[13]Although <u>Warren</u> involved a prior version of the Georgia Constitution, the same relevant language is in the current version of the Georgia Constitution. See <u>Warren</u>, 231 Ga. at 499. The plain language of Georgia's Constitution makes the powers and duties of the constitutional sheriff's office alterable by the Georgia legislature and unalterable by the county or its governing body.

exercise no authority or control over the sheriff's force policy, whether in making arrests on the streets or in quelling disruptive inmates at the jail.

Further, in Georgia, counties also do not delegate any of their governmental or police powers to sheriffs. Instead, the sheriffs' authority and duties are derived directly from the State. That counties delegate no power or authority to sheriffs further explains why counties have no authority or control over them and why the sheriff is not a subunit or division of county government.

Georgia law likewise makes the county entity itself, here Clinch County, a separate entity independent of the sheriff's office. Under Georgia law, Clinch County is a "body corporate" capable of suing and being sued and is headed by the county governing authority. Ga. Const. art. 9, § 1, ¶ 1 ("Each county shall be a body corporate and politic with such governing authority . . . as provided by law."); O.C.G.A. §§ 36-1-3 ("Every county is a body corporate, with power to sue or be sued in any court."); 1-3-3(7) (defining "County governing authority" as "the board of county commissioners, the sole county commissioner, or the governing authority of a consolidated government"). As a separate entity, Clinch County is headed by its Board of Commissioners, which is given "exclusive jurisdiction over and control of county affairs." Ga. Laws 1933, p. 467, § 29. In contrast, under Georgia's Constitution, the State has exclusive authority and control over the duties and affairs of the sheriff's office. Although the State requires the county to

fund the sheriff's budget, Georgia's Constitution precludes the county from exercising any authority over the sheriff, including how the sheriff spends that budget. Ga. Const. art. IX, § 2, ¶ 1(c)(1); Chaffin v. Calhoun, 262 Ga. 202, 203-04 (1992); see Boswell v. Bramlett, 274 Ga. 50, 52 (2001).

The separate and distinct nature of Sheriff Peterson's office and Clinch County, and their independence from each other, are further demonstrated by how Georgia law treats sheriffs' employees. Sheriffs alone hire and fire their deputies. See O.C.G.A. § 15-16-23. Deputies, including those serving as jailers, are employees of the sheriff and not the county. Warren, 231 Ga. at 499 (recognizing that "[d]eputy sheriffs and deputy jailors are employees of the sheriff, whom the sheriffs alone are entitled to appoint or discharge") (quotation marks omitted); Drost v. Robinson, 194 Ga. 703, 710 (1942); Brown v. Jackson, 221 Ga. App. 200, 201 (1996) (noting deputy sheriffs "were employees of the sheriff and not Peach County"); Wayne County v. Herrin, 210 Ga. App. 747, 751 (1993); Pettus v. Smith, 174 Ga. App. 587, 588 (1985); see Boswell, 274 Ga. at 51 ("[E]mployees of constitutionally elected officers of a county are considered employees of the elected officer and not employees of the county, as represented by the local governing authority."); Mobley v. Polk County, 242 Ga. 798, 801-02 (1979).[14]

_____

[14]This case involves the acts of Deputy Sheriff Brown, who served as Sheriff Peterson's chief jailer. Sheriffs may assign their deputy sheriffs to work at the jail. See O.C.G.A. § 15-16-23; Wayne County v. Herrin, 210 Ga. App. 747, 751 (1993); Kendrick v. Adamson, 51 Ga. App. 402 (1935). In Wayne County, the Georgia court read the sheriff's power to hire and fire deputy

Because sheriffs are elected by county voters, it is not surprising that Georgia's Constitution labels sheriffs as "county officers." Ga. Const. art. IX, § 1, ¶ 3(a). But, given how Georgia's Constitution also makes the sheriff's office a constitutional office independent from the county entity itself, precludes all county control, and grants only the State control over sheriffs, this "county officer" nomenclature necessarily reflects a geographic label defining the territory in which a sheriff is elected and mainly operates. It is entirely consistent for sheriffs to be independent of the county government and to be subject to State, not county, control but to be called "county officers" to reflect their geographic jurisdiction in the State.

Having established that Sheriff Peterson's office is independent from Clinch County and its governing authority and that only the State controls and grants powers and duties to sheriffs, we next examine the functions of the sheriff's office

sheriffs under O.C.G.A. § 15-16-23, together with O.C.G.A. § 36-1-21, to mean that the sheriff may appoint his deputies "at will," but also may elect in writing to make their appointments subject to the county civil service system as prescribed by law in O.C.G.A. § 36-1-21. Wayne County, 210 Ga. App. at 752-53; see Brett v. Jefferson County, 123 F.3d 1429, 1434 (11th Cir. 1997) (stating deputy sheriffs in Georgia are at-will employees of the sheriff and concluding sheriff had failed to satisfy the statutory requirements in O.C.G.A. § 36-1-21 necessary for the sheriff to place his employees under the county civil service system).

Sheriffs also may appoint persons to serve as jailers who are not deputy sheriffs. See Tate v. Nat'l Sur. Corp., 58 Ga. App. 874, 876 (1938) (noting "[t]here was no evidence that the jailer was also a deputy"). O.C.G.A. § 42-4-1 provides: "By virtue of their offices, sheriffs are jailers of the counties and have the authority to appoint other jailers, subject to the supervision of the county governing authority, as prescribed by law." We likewise read O.C.G.A. §§ 42-4-1 and 36-1-21 together to mean that the sheriff may appoint his non-deputy jailers "at will" under O.C.G.A. § 42-4-1, but also may elect in writing to make their appointment subject to the county civil service system and thereby subject to county supervision as prescribed by law in O.C.G.A. § 36-1-21. In any event, this case does not involve a jailer who is not a deputy sheriff.

14

under Georgia law. The specific tasks that sheriffs perform also shed considerable light on the character of the sheriff's office under Georgia law.

## B. Sheriff's Functions

As noted above, counties cannot, and do not, grant any law enforcement power to sheriffs and do not assign or control any of the sheriffs' duties. Instead, the State alone has delegated to sheriffs specific duties in three main areas: (a) law enforcement; (b) state courts; and (c) corrections. While we ultimately decide today only whether Georgia sheriffs wear a "state hat" in prescribing use-of-force policy, we outline the duties the State has assigned to sheriffs as they reflect the character of the sheriff's office under Georgia law. What duties the State assigns sheriffs is indicia of how the State defines that entity.

### 1. Law Enforcement

In Georgia, the office of sheriff is as old as the State of Georgia itself and carries with it the common law duties of sheriffs to enforce the laws and preserve the peace on behalf of the sovereign State, as well as other specific statutory duties imposed by the State legislature. O.C.G.A. § 15-16-10(a)(1)-(8); Hannah v. State, 212 Ga. 313 (1956) ("The office of sheriff carries with it . . . all of its common-law duties and powers, except as modified by statute.") (citation and quotation marks omitted).[15] Given the sheriff's continuing common law duties, the State legislature

_____

[15]The Georgia Attorney General also has explained that under Georgia law, sheriffs have statutory duties and also all of their common law duties and powers unless modified by statute,

15

mandates that it is the express duty of the sheriff to perform not only "such . . .

duties as are or may be imposed by law," but also those duties "which necessarily

appertain to his or her office." O.C.G.A. § 15-16-10(a)(8).

Georgia's Constitution also provides that "[t]he Governor shall take care

that the laws are faithfully executed and shall be the conservator of the peace

throughout the state." Ga. Const. art. V, § 2, ¶ 2. In enforcing the laws and

conserving the peace, the Georgia Governor does not act alone, but necessarily

acts through state agents, which include sheriffs for certain state functions.[16] The

United States Supreme Court recently acknowledged that sheriffs historically had

geographic restrictions but in reality "represented the State in fulfilling [their] duty

to keep the peace." McMillian v. Monroe County, 520 U.S. 781, 793 (1997)

(concluding that Alabama sheriffs act for the state as to the law enforcement

function in issue). The Supreme Court reflected on the longstanding historical

role of sheriffs, as follows:

> As the basic forms of English government were
> transplanted in [the United States], it also became the
> common understanding here that the sheriff, though limited

---

and that these duties include enforcing the laws and conserving the peace. See Ga. Op. Atty. Gen. No. 77-83 (1977); Ga. Op. Atty Gen. No. U69-385 (1969) (both construing former Georgia Code § 24-2813 (1933), now O.C.G.A. § 15-16-10). In addition, sheriffs must be state-certified peace officers, who are "vested . . . with authority to enforce the criminal or traffic laws through the power of arrest and [are charged with the] preservation of public order, the protection of life and property, and the prevention, detection, or investigation of crime." O.C.G.A. § 35-8-2(8)(A).

[16]Other state actors available for law enforcement activity include the Georgia Bureau of Investigation and the Georgia State Patrol. See O.C.G.A. §§ 35-3-3 et seq.; § 35-2-30 et seq.

in jurisdiction to his county and generally elected by county voters, was in reality an officer of the State, and ultimately represented the State in fulfilling his duty to keep the peace.

Id. at 794 (internal footnote omitted). Indeed, "in conserving the public peace, in vindicating the law, and in preserving the rights of the government, [the sheriff] represents the sovereignty of the State and he has no superior in his county." 1 W. Anderson, A Treatise on the Law of Sheriffs, Coroners and Constables 5 (1941), cited with approval in McMillian, 520 U.S. at 794.

As we already have noted, sheriffs in Georgia derive their power and duties from the State, are controlled by the State, and counties cannot, and do not, delegate any law enforcement power or duties to sheriffs.[17] In Georgia, this historical role of the sheriff thus continues to this day as the sheriff directly represents the sovereignty of the State, has no superior in his county, and performs state functions for the sovereign in enforcing the laws and keeping the peace.

It is also entirely consistent for Georgia sheriffs to be elected by county voters and be called "county officers" to reflect their geographic jurisdiction, but

---

[17]While the State fulfills part of its policing functions through the sheriff's office, the Georgia legislature authorizes the county to fulfill policing functions through a county police force. County governing bodies may create "a county police force" through a resolution or ordinance of the particular county governing body followed by the approval of qualified county electors. O.C.G.A. § 36-8-1(b). Thus, a county-wide referendum is required before a county may create a county police force. Id. If the referendum passes, the county governing body controls the hiring and removal of its county police, including the county police chief, and may "abolish a county police force at any time." O.C.G.A. § 36-8-2. County police officers are subject to the "direction and control of the county governing body." O.C.G.A. § 36-8-5.

for them still to act on behalf of the State in enforcing the laws and keeping the peace in that jurisdiction. See R. Cooley, Handbook on the Law of Municipal Corporations 512 (1914) ("Sheriffs . . . clerks and other so-called county officers are properly state officers for the county. Their functions and duties pertain chiefly to the affairs of state in the county.").[18]

### 2. State Courts

In addition to imposing certain law enforcement duties, the State has assigned sheriffs specific duties in the State's superior courts.[19] Superior courts are the State's trial courts of general jurisdiction. See Ga. Const. art. 6, § 4, ¶ 1; O.C.G.A. § 15-6-8.[20] That sheriffs perform an integral role in the state judicial system is further indicia of how sheriffs act for the State.

The State mandates that sheriffs must attend "all sessions" of superior courts in their respective counties and "never . . . leave [court] without the

---

[18]For example, the State has assigned sheriffs the task of maintaining and entering warrant information into the statewide criminal information database. O.C.G.A. § 35-3-36; see Grech v. Clayton County, __ F.3d __ (11th Cir. 2003) (en banc) (concluding "as to the particular function at issue [entry and maintenance of warrant information], the sheriff is acting on behalf of the State and thus . . . Clayton County is not liable [for the sheriff's conduct at issue]").

[19]Throughout this opinion, the term "state courts" refers only to Georgia's superior courts, which have exclusive jurisdiction over state felony cases, divorce cases, cases respecting title to land, and cases arising in equity. Ga. Const. art. VI, § 4, ¶ 1. Georgia's superior courts also have concurrent jurisdiction over misdemeanors and other civil cases. Ga. Const. art. VI, § 4, ¶ 1; O.C.G.A. §§ 15-6-8(1); 15-7-4.

[20]Just as county jails house state criminal offenders, county courthouses, funded and built by the county, house state superior courts and their judges. O.C.G.A. § 15-6-24. Although presiding in county courthouses, superior court judges perform state judicial functions.

presence of himself or his deputy." O.C.G.A. § 15-16-10(a)(2). The State also mandates that sheriffs must execute and return the processes and orders of the state courts. O.C.G.A. § 15-16-10(a)(1). Sheriffs also must publish sales, citations, and other proceedings as required by law, keep an execution docket, keep a book of all sales made by process of state courts, and keep many other specified records. O.C.G.A. § 15-16-10(a)(4)-(6). This same statute provides that "[i]f any sheriff or deputy fails to comply with any provision of [O.C.G.A. § 15-16-10(a)], he shall be fined for a contempt." O.C.G.A. § 15-16-10(b). Thus, the State directs sheriffs to enforce state court orders and punishes them if they do not. The superior court clerk also delivers to the sheriff or his deputy a "precept containing the names of the persons drawn as grand jurors," and the sheriff or his deputy serves the summons on each grand juror in person or by mailing, as determined by the sheriff. O.C.G.A. § 15-12-65.[21]

The State also has assigned sheriffs the function of determining which companies may make bonds in their jurisdictions. O.C.G.A. § 17-6-15. While state judges decide whether a county jail inmate, charged with a felony, is entitled to bond, sheriffs approve bonding companies in their counties for the State's

---

[21]Superior court judges "are authorized and empowered to transfer the investigation by a grand jury from the county where the crime was committed to the grand jury in any other county in the State" in certain circumstances. O.C.G.A. § 15-12-82(a). When this transfer occurs, "[t]he sheriff and the clerk of the superior court of the county in which the crime was committed shall be qualified and authorized to perform the duties of such officers in the same manner as if there had been no change of venue." O.C.G.A. § 15-12-82(d).

criminal cases. Sheriffs must "publish and make available written rules and regulations defining acceptable sureties and prescribing under what conditions sureties may be accepted." O.C.G.A. § 17-6-15(b)(1). The State also prescribes the qualifications of "professional bondspersons." O.C.G.A. § 17-6-50. The State in effect "places the authority to accept sureties in felony cases in the office of the sheriff and not in the superior court."[22] Jarvis v. J&J Bonding Co., 239 Ga. 213, 215 (1977) (construing Georgia Code § 27-418 (1933), which is the precursor to O.C.G.A. § 17-6-15).

The State also requires sheriffs to "deposit cash bonds held by the sheriff in one or more interest-bearing trust accounts," O.C.G.A. § 15-16-27(a), and to remit that interest to a state agency, the Georgia Indigent Defense Council. O.C.G.A. §§ 15-16-27(b); 17-12-32. That Council then redistributes the money to local indigent defense programs. O.C.G.A. §§ 15-16-27(b); 17-12-30 et seq.[23]

These state court and bond-related duties do not stem from laws of general application, but from statutes whereby the State requires sheriffs to perform

---

[22] In criminal cases, state courts may require witnesses to post bonds to ensure their appearance, O.C.G.A. § 17-7-26, and the sheriff is responsible for accepting bonds and ensuring that they come from a bonding company approved by the sheriff. O.C.G.A. § 17-7-27.

[23] On May 22, 2003, the Governor signed the Georgia Indigent Defense Act of 2003 ("the Act"), which amends O.C.G.A. Chapter 17-12 and O.C.G.A. § 15-16-27. H.B. 770, 147th Gen. Assem., Reg. Sess. (Ga. 2003). The Act does not change the requirement in O.C.G.A. § 15-16-27(a) that sheriffs "deposit cash bonds held by the sheriff in one or more interest-bearing trust accounts." However, pursuant to the amended § 15-16-27(b), effective December 31, 2003, sheriffs must remit the interest to the Georgia Public Defender Standards Council, a state agency, for distribution to the circuit public defender offices instead of to the Georgia Indigent Defense Council.

specific tasks that are state functions in the State's criminal justice system. These statutes are not mere general regulatory control. Instead, they represent the State delegating discrete state functions in the State's criminal justice system specifically to sheriffs.

### 3. Corrections

The State also assigns sheriffs specific corrections duties regarding state offenders. The State requires that the sheriff take custody of all inmates in the jail in his county. O.C.G.A. § 42-4-4. The Georgia legislature mandates that "[i]t shall be the duty of the sheriff . . . [t]o take from the outgoing sheriff custody of the jail and the bodies of such persons as are confined therein" and to furnish inmates "medical aid, heat, and blankets, to be reimbursed if necessary from the county treasury." O.C.G.A. § 42-4-4(a)(1)-(2). Sheriff Peterson's authority and duty to administer the jail in his jurisdiction flows from the State, not Clinch County. See In re Irvin, 254 Ga. 251, 253 (1985) ("It is clear that the legislature has vested broad authority in the office of sheriff to administer the jails."). Sheriffs who refuse to take custody of an inmate may be charged with a misdemeanor. O.C.G.A. § 42-4-12.

It is important to outline how the State uses county jails to incarcerate its state offenders and, in turn, requires sheriffs to administer them. To begin with, sheriffs must take custody of inmates arrested and awaiting trial in state superior

21

courts on <u>state</u> felony and misdemeanor charges.[24]  No sheriff's approval is required.  For example, a City of Homerville police officer arrested plaintiff Manders for felony obstruction of an officer–in violation of state law, O.C.G.A. § 16-10-24(b)–and took Manders to the Clinch County jail.

As custodians of pre-trial detainees charged with state felonies, sheriffs transfer inmates to and from the State's superior courts for pre-trial and trial proceedings, as well as attend all sessions of those courts.  If a change of venue for the trial is granted by the state trial judge, the sheriff must transport the person to the county to which the change of venue is directed and deliver that person to the sheriff of that county.  O.C.G.A. § 42-4-11.

Another class of inmates in the county jails are those serving state sentences for felonies.  When convicted of a felony offense, the felon by operation of Georgia law is committed to the custody of the Georgia Department of Corrections ("DOC"), which determines the place of confinement.  O.C.G.A. §§ 42-5-50(b);

---

[24]<u>See</u> <u>Howington v. Wilson</u>, 213 Ga. 664, 665 (1957) ("It is apparent from [Georgia] statutes that the custody of a defendant, pending his trial under an indictment for a criminal offense, is in the sheriff of the county wherein the offense was committed . . . ."); <u>State v. Middlebrooks</u>, 236 Ga. 52, 52-53 (1976) (defendant originally detained in City of Atlanta jail transferred to custody of the Fulton County Sheriff upon indictment).

42-5-51(b).[25]  In at least five situations, convicted felons serve their <u>state</u> sentences in county jails.

First, a convicted felon, although in DOC custody, serves his state felony sentence in the county jail pending appeal if his attorney certifies his presence is necessary for the appeal.  O.C.G.A. § 42-5-50(c).  No sheriff or DOC approval is required.[26]  The DOC's regulations even provide that the State will pay for the cost of maintaining felony prisoners in county jails after conviction and sentencing until their appeals are concluded.  Ga. Comp. R. & Regs. § 125-2-4-.02(d).[27]

Second, due to prison overcrowding, the DOC has broad discretion to assign convicted felons to serve their state sentences in county jails and to reimburse counties for their incarceration at a daily rate.[28]  The state trial court must notify

---

[25]The state superior court has no authority to sentence a person convicted of a felony other than to the custody of the commissioner of the Georgia Department of Corrections, and the State has authority over the inmate on the place of confinement and on the computation of sentence.  <u>See</u> <u>Eubanks v. State</u>, 229 Ga. App. 667, 667-68 (1997).  The State may allow felons to remain in the county jail and reimburse the county.  O.C.G.A. § 42-5-51(b)-(c).

[26]<u>See</u> <u>Helmeci v. State</u>, 230 Ga. App. 866, 871 (1998) (stating that O.C.G.A. § 42-5-50(c) "is clearly couched in mandatory language, indicating that a trial court has no discretion in denying a request to remain in the county pending appeal"); O.C.G.A. § 42-5-50(b) (stating except as otherwise provided in O.C.G.A. § 42-5-50(c), the DOC shall assign the place of confinement for convicted felons).

[27]"The Department of Corrections will provide reimbursement to counties for cost of maintaining felony prisoners in the county jails after conviction and sentencing and before such prisoners are transferred to a place of confinement as directed by the Commissioner, Department of Corrections."  Ga. Comp. R. & Regs. § 125-2-4-.02(d) (describing reimbursement procedure and including felons remaining in county jail during appeal as inmates for which reimbursement may be obtained).

[28]<u>See</u> <u>Clayton County v. Evans</u>, 258 Ga. 146, 147 (1988) (noting "the General Assembly–aware of the problem of the existence of overcrowded state prisons–made provision in

the DOC that a person is convicted of a felony within thirty days. O.C.G.A. § 42-5-50(a). The DOC then has fifteen days to elect to transfer the inmate or to start paying for his incarceration. O.C.G.A. § 42-5-51(c). No sheriff's approval is required.

Third, if a convicted felon's state probation is revoked, a state judge has discretion to sentence the felon to serve his state sentence in the county jail in certain circumstances. O.C.G.A. § 17-10-1(a)(3)(A). No sheriff's approval is required.

Fourth, convicted felons serving a paroled state sentence, under the DOC's authority, who violate parole may be held in county jails until a state judge formally revokes their state parole. Ga. Op. Atty. Gen. No. 82-33 (1982). No sheriff's approval is required.

Fifth, convicted felons in DOC custody may serve their state sentences in county jails if they are participating in a state-sponsored project and the sheriff approves. O.C.G.A. § 42-5-51(d).

Yet another class of inmates in county jails are those serving state misdemeanor sentences. If a defendant is convicted of a state misdemeanor

---

O.C.G.A. § 42-5-51(c) for the reimbursement to the county . . . for the cost of incarcerating state prisoners").

offense, the state judge has discretion to sentence the defendant to, among other locations, the "county jail."[29]  O.C.G.A. § 17-10-3(a)(1)-(3).

Because the State uses the statewide network of county jails to incarcerate its felony and misdemeanor offenders, it is not surprising that the State expressly authorizes sheriffs to act beyond their respective counties and to transfer prisoners to the county jails of other sheriffs.[30]  In addition to venue changes, the State requires sheriffs to take persons arrested to a jail of another county if the sheriff's county jail is in an "unsafe condition."  O.C.G.A. § 42-4-4(a)(3).[31]

The State also permits sheriffs to exercise their discretion to "transfer[] a prisoner to another jail in another county if the sheriff concludes that such transfer

---

[29]The other locations include a "county correctional institution;" a "state probation detention center or diversion center;" or a "state correctional institution" if the "crime was committed . . . within the confines of a state correctional institution."  O.C.G.A. § 17-10-3(a)(1)-(3). Under Georgia law, county jails are separate facilities from "county correctional institutions."  See O.C.G.A. § 42-5-53.

[30]In operating the jail, Sheriff Peterson also must carry out many state policies on how inmates are treated and jails are operated.  The State regulates the preparation, service, and number of meals and inspects the jail periodically "to ensure against the presence of unsanitary conditions."  O.C.G.A. § 42-4-32(a)-(c).  The State prescribes that a jailer shall not be "guilty of willful inhumanity or oppression to any inmate under his care and custody."  O.C.G.A. § 42-4-5.  The State sets the minimum safety and security requirements for jails.  O.C.G.A. § 42-4-31(a).

We do not contend that these statutory jail duties, by themselves, transform sheriffs into state officials.  Instead, we mention these statutes as further evidence of how the duties of sheriffs in Georgia are governed by the State and not by county governing bodies.  This background is relevant to our consideration of whether the sheriff is an arm of the state or the county in establishing force policy as to Manders.

[31]With respect to § 42-4-4(a)(3) transfers, the Georgia Supreme Court instructs that "[t]he legislature has vested the sheriff alone with the . . . administrative authority to order such transfers" and that a state superior court may not order such a transfer sua sponte, although the sheriff would be required to carry out an order of the court if the issue of the unsafe conditions of the jail were properly before the court.  In re Irvin, 254 Ga. 251, 253-54 (1985).

25

is in the best interest of the prisoner or that such transfer is necessary for the orderly administration of the jail." O.C.G.A. § 42-4-4(b). In a similar vein, "[w]hen there is no secure jail in a county or when it is deemed necessary by the sheriff, any person committing an offense in the county may be sent to a jail in another county determined to be suitable by the sheriff." O.C.G.A. § 17-7-1.[32]

Given sheriffs' significant corrections role for state offenders, the State further requires sheriffs to keep detailed records of persons committed to county jails. O.C.G.A. § 42-4-7. These records include the "age, sex, race, under what process such person was committed and from what court the process issued, the crime with which the person was charged, the date of such person's commitment to jail, the day of such person's discharge, under what order such person was discharged, and the court from which the order issued." O.C.G.A. § 42-4-7(a). The State mandates that a sheriff or a deputy who fails to comply with these state requirements shall be fined for contempt and subject to removal from office. O.C.G.A. § 42-4-4(c).

In sum, these requirements are <u>not</u> state laws of general application but represent the State's managing and controlling where state offenders are

---

[32]Although a state felony inmate has a right to remain in the county jail during appeal under O.C.G.A. § 42-5-50(c), the sheriff may transfer that inmate to another jail if the sheriff's jail is unsafe. See Helmeci, 230 Ga. App. at 871 (concluding the "conditions authorizing transfer [under O.C.G.A. § 42-4-4(a)(3) were] not present" and "the trial court erred in denying Helmeci's motion to remain in the county jail pending the disposition of his appeals").

incarcerated, designating that certain state offenders serve state time in county jails, and then assigning sheriffs specific corrections duties regarding those state offenders.[33] In contrast, counties have no authority over what corrections duties sheriffs perform, or which state offenders serve time in county jails, or who is in charge of the inmates in the county jails.[34]

---

[33]Sheriffs' incarceration of offenders in the county jail, such as Manders, who are charged with state felonies and being prosecuted by the State of Georgia in state superior courts is a state function. The State requires that sheriffs not only transport state offenders to and from state superior courts and attend all sessions of those state courts, but also take custody of state offenders in county jails between those state superior court sessions. The State of Georgia has a Department of Corrections, a state agency, that operates state prisons and incarcerates felony offenders after conviction. But the existence of the Department of Corrections does not preclude the State from utilizing other law enforcement agencies, such as sheriffs, to perform part of the State's incarceration function for state offenders. As detailed above, the State requires sheriffs to take custody of state offenders, both pre- and post-conviction, in county jails, and counties have no law enforcement or other corrections authority over state offenders in county jails.

In fact, it makes sense for the State to utilize the network of county jails to incarcerate state offenders in the location of the state superior courts not only during pre-trial and trial, but also while the inmates serve state sentences during their appeals. Indeed, as explained above, the Department of Corrections can elect to have state offenders serve the entire state sentence in the county jail. That the State also operates state prisons and requires Clinch County to build and fund a county jail and to provide food, clothing, and medical necessities to inmates does not diminish the important state functions that Sheriff Peterson performs relative to state offenders, such as Manders, in the county jail.

[34]Griffin v. Chatham County, 244 Ga. 628 (1979), underscores how counties lack authority over sheriffs' operation of county jails. In Griffin, the Georgia Supreme Court concluded that the sheriff must accept city prisoners only because a local act of the State legislature granted Chatham County power over the county jail and that County's commission had contracted with the City of Savannah to maintain city prisoners in the county jail. Id. at 629-30. Griffin involved a local act by the State legislature that was applicable only to Chatham County. That local act granted the Chatham County commissioners considerable power over the county jail as follows: "Said Commissioners [of Chatham County] shall have power to make proper rules and regulations for the government and control of said jail of Chatham County, and the prisoners and inmates therein, and, except as hereinbefore provided, are hereby invested with the management and care of said jail." Griffin, 244 Ga. at 630 n.8 (quotation marks omitted) (alteration in original). In the present case, there is no similar local act by the State legislature regarding the Clinch County jail. Absent such a local act, counties are precluded from power or authority over sheriffs.

# IV. APPLYING ELEVENTH AMENDMENT FACTORS

Having examined Georgia's law governing sheriffs, we now specifically apply the Eleventh Amendment factors to Sheriff Peterson's particular functions in issue. We need not, and do not, decide today whether Georgia sheriffs wear a "state hat" for Eleventh Amendment purposes for all of the many specific duties assigned directly by the State. We have recounted these duties as relevant Georgia law that reflects on the nature and character of the sheriff's office. We, however, must decide here only whether Sheriff Peterson is an "arm of the State" in establishing force policy at the jail and in training and disciplining his deputies in that regard.

## A. How State Law Defines the Entity

The first factor in the Eleventh Amendment analysis is how Georgia law defines the sheriff's office. In Georgia, the office of sheriff is an elected constitutional office. Although a sheriff performs his duties mainly, although not always, within the geographical confines of a county, the essential governmental nature of his office is (a) to continue to perform his historical common law duties to enforce the law and preserve the peace on behalf of the sovereign State and (b) to perform specific statutory duties, directly assigned by the State, in law enforcement, in state courts, and in corrections. Most of those duties are an integral part of the State's criminal justice system and are state functions.

Moreover, the sheriff's office is a separate and independent office from both Clinch County and its governing body. Counties delegate no powers or duties to sheriffs. Sheriff Peterson and his deputies at the jail are not employees of Clinch County. Indeed, Georgia's Constitution precludes Clinch County from having any control over the sheriff's office.

Although the specific duties the State assigns to sheriffs shed considerable light on the character of the sheriff's office, we must focus on the nature of the particular function at issue here: force policy. The sheriff's authority to use force or the tools of violence, whether deadly or non-deadly force, and the sheriff's obligation to administer the jail are directly derived from the State and not delegated through the county entity. In addition, use of force and creating force policy are quintessential policing functions, exercised by sheriffs in initial arrests, in subduing inmates in sessions of state superior courts, or in quelling disruptive inmates in county jails.

While we must consider context, the location where the sheriff's policing function is performed does not automatically transmute the function into a state function or a county function. In administering the jail, the sheriff does not check his arrest powers or force authority at the door. Instead, he and his deputies bring them into the jail and exercise them in the jail setting. This case is not a case of feeding, clothing, or providing medical care to inmates, which necessarily occur

within the jail. Instead, it involves Sheriff Peterson's force policy, which happens to be at issue in the jail context in this particular case. While the jail context is important, it likewise is significant that the sheriff's force policy is at issue in many settings and that location alone does not control. It is also material that the State uses the county jail to incarcerate not only pretrial detainees charged with state offenses, such as Manders, but also state offenders serving state sentences after conviction.

Based on our review of Georgia law, we conclude that the sheriff wears a "state hat" when he creates and implements force policy in the jail.[35] Thus, this first factor weighs heavily in favor of immunity.

---

[35]The dissent raises a parade of hypothetical scenarios from the Chief of the Atlanta Police Department to a security guard watching the cosmetics counter at a department store. (Dissent, Barkett, J., p. 59). Nowhere does this opinion in any way suggest or imply that a private security guard's or a city or county police officer's power to arrest or use force entitles that officer to Eleventh Amendment immunity. All certified peace officers in Georgia have certain arrest and force powers granted by the State. The key question is not what arrest and force powers sheriffs have, but for whom sheriffs exercise that power. A city delegates and exercises its policing function through its city police officers and a county through county police officers, and thus city and county police officers act for and represent the city and county, respectively. In contrast, the State delegates and performs certain state policing and corrections functions through several law enforcement agencies, including sheriffs, and sheriffs act for and represent the State in those assigned tasks. As explained previously, under Georgia law counties lack power in the area of law enforcement except to operate a county police force. See supra note 17.

What additionally makes sheriffs distinct from city and county police officers is that the State expressly has vested in sheriffs specific state functions and that sheriffs utilize their arrest and force powers in executing state functions. As detailed above, sheriffs perform a variety of specific state functions in the State's criminal justice system, from attending every session of state superior court, to taking custody of state offenders, both pre- and post-conviction, in county jails. Sheriff Peterson's authority over inmates and the duty to administer the jail flow from the State, not Clinch County, those functions and duties pertain chiefly to affairs of the State in Clinch County, and Clinch County plainly has no control or authority over Sheriff Peterson's force policy at the jail or his deputies at the jail.

**B.      Where State Law Vests Control**

The second factor of the Eleventh Amendment analysis examines where

Georgia law vests control.  In addition to mandating and controlling sheriffs'

specific duties as outlined above, only the State possesses control over sheriffs'

force policy and that control is direct and significant in many areas, including

training and discipline.

**1.  State Requires Annual Training of Sheriffs**

The State requires <u>annual</u> specialized training of sheriffs in all counties by

the Georgia Sheriffs' Association with the assistance of the Georgia Public Safety

Training Center.[36]  O.C.G.A. § 15-16-3.  The annual training of sheriffs "shall be

generally devoted to contemporary law enforcement, investigation, judicial

process, and corrections practices and specifically shall be germane to the . . .

office of sheriff in the several counties of this state."  O.C.G.A. § 15-16-3(a).  The

"purpose of this Code section [O.C.G.A. § 15-16-3] is to promote professionalism

within the office of sheriff by ensuring the highest possible quality of law

enforcement training is offered to each sheriff on an annual basis."  O.C.G.A. §

15-16-13(a).  It is reasonable to assume that such training includes instruction on

---

[36]The State prescribes the qualifications for sheriffs.  The Georgia legislature has declared that "proper qualifications and standards be required of the . . . sheriff so as to increase the effectiveness . . . of the several sheriffs of this state as law enforcement officers to combat crime." O.C.G.A. § 15-16-1(a).  The State mandates a detailed set of qualifications that a person must satisfy to be a candidate for the sheriff's office in any county.  <u>See</u> O.C.G.A. § 15-16-1(a)-(c).

force policy and hiring and training deputies. Sheriff Peterson testified that in preparing the force policy in his Manual he adopted some state policies. Furthermore, the Georgia Sheriffs' Association uses state funds (or federal funds distributed to the State) to cover all training costs. See O.C.G.A. § 15-16-3(d).

Notably, if a sheriff fails to comply with the annual training requirements, the Governor–the State's chief–may suspend the sheriff without pay for ninety days. O.C.G.A. § 15-16-3(e)(4). The State also mandates that a sheriff's failure to complete annual training requirements will result in the loss of arrest powers. O.C.G.A. § 15-16-3(e)(1),(4). Again, these rules are not laws of general application, but are specific statutes whereby the State directly requires annual training of all sheriffs, controls the training subject matter, pays for the training, and sanctions sheriffs for non-compliance. In contrast, counties have no control over sheriffs or their training.

### 2. Governor Disciplines Sheriffs

In addition, the Governor has broad investigation and suspension powers regarding any misconduct by a sheriff in the performance of any of his duties. O.C.G.A. § 15-16-26.[37] If a sheriff's policy permits excessive force in the county jail, plainly the Governor may discipline the sheriff. If a sheriff fails to take

---

[37]The Governor may determine that an investigation of a sheriff "should be made as a result of criminal charges, alleged misconduct in office, or alleged incapacity of the sheriff to perform the functions of his office." O.C.G.A. § 15-16-26(a).

custody of state offenders in the county jail, plainly the Governor may discipline the sheriff. The State legislature expressly has made Sheriff Peterson answerable to the Governor for his conduct and policies.

Specifically, the Governor may initiate an investigation of any suspected misconduct by any sheriff and may suspend the sheriff. O.C.G.A. § 15-16-26(a), (c). The Governor selects two sheriffs, who along with the State Attorney General, conduct the investigation for the Governor. O.C.G.A. § 15-16-26(a). The State funds the investigation. Id.

If the Governor's committee recommends suspension to the Governor, the Governor may suspend the sheriff for sixty days and extend that suspension for thirty additional days. O.C.G.A. § 15-16-26(c). This disciplinary procedure is direct, substantial, and immediate state control over the sheriff's acts. If Sheriff Peterson permits excessive force, all the Governor must do is have a committee immediately investigate and report, and the Governor can suspend him.[38]

Moreover, if the Governor believes the sheriff should be removed from office, the Governor is "authorized to request the district attorney of the county of

---

[38]A wholly separate statute, O.C.G.A., § 45-5-6, provides for removal of any public official upon a felony indictment. See Gipson v. Bowers, 263 Ga. 379 (1993) (stating that the Governor "can take no official action against a sheriff unless there has been a criminal indictment" first). The above Georgia statute, O.C.G.A. § 15-16-26, however, is not a law of general application to all public officials but independently addresses only sheriffs and the Governor's investigation and suspension of sheriffs for any misconduct in office, which do not require a criminal indictment or even any suspected criminal activity. Compare O.C.G.A. § 15-16-26, with § 45-5-6.

the sheriff's residence to bring a removal petition against the sheriff" based upon the evidence reported by the Governor's investigation committee.[39]  Id.  The Governor may order additional investigation "by the committee, by the Georgia Bureau of Investigation, by other law enforcement agencies . . .  or by any special committee appointed by the Governor for such purpose."  O.C.G.A. § 15-16-26(c).

### 3.  Counties Lack Control

In contrast, counties have no authority, control over, or involvement in Sheriff Peterson's force policy at the jail, or his training and disciplining of deputies in that regard.  While Georgia counties have obligations involving the jail structure and inmates' food, clothing, and medical necessities, such duties involve wholly separate and distinct matters from the sheriff's force policy at the jail and his training and disciplining of deputies in that regard.[40]

---

[39]The Governor necessarily acts through others in filing removal petitions, and the district attorney acts for the State in filing a petition to remove a sheriff.  See Owens v. Fulton County, 877 F.2d 947, 951-52 (11th Cir.1989) (concluding district attorney acted for the State of Georgia and not Fulton County in prosecution decisions, even though elected by only Fulton County voters and although his office's budget was provided in large part by county funds).  The state judicial proceedings for removal of a sheriff are identical to those for the removal of a clerk of the superior court under O.C.G.A. § 15-6-82.  O.C.G.A. §§ 15-16-10(b) & 42-4-4(c).

[40]It has been suggested that counties have more oversight than the State over the sheriff's operation of the jail because "county governing authorities have at their disposal the investigative powers of grand juries, see [O.C.G.A.] § 15-12-71(c) (2001), which must inspect jails annually and make appropriate recommendations to the county commission. [O.C.G.A.] § 15-12-78." (Dissent, Barkett, J., p. 74).  This suggestion misapprehends these statutes and the well-established function of grand juries in the State's justice system.

Under Georgia law, the grand jury has two principal duties.  First, the grand jury historically and functionally is a wholly independent investigating and accusing body in the State's felony cases.  O.C.G.A. §§ 15-12-61, 15-12-71, 15-12-74, 15-12-82, 15-12-100.  Second, the State vests in the grand jury the civil power and function of inspecting and investigating not just the county jail, but any county building, the county governing body itself, or any county

34

Because of the State's direct and substantial control over the sheriff's duties, training, and discipline and the county's total lack thereof, this control factor also weighs heavily in favor of Sheriff Peterson's entitlement to Eleventh Amendment immunity.[41]

## C.    Funds

commissioner.  O.C.G.A. § 15-12-71(b)(2).  Because the grand jury is independent and equally oversees county governing authorities, it cannot fairly be said that grand juries work at the counties' disposal or act for counties in investigating sheriffs or county jails.

Instead, grand jurors, like sheriffs, are drawn from the county, paid with county funds, but perform discrete functions in the State's justice system.  To the extent supervision exists, superior court judges in the state judicial system supervise grand juries.  O.C.G.A. §§ 15-12-71(a); 15-12-80, 15-12-100(a), 15-12-101.  Superior court judges draw and impanel grand jurors, charge them, administer their oaths, and select their foreperson or direct the jury itself to select a foreperson.  O.C.G.A. §§ 15-12-62, 15-12-68.

Given that many state offenders serve time in county jails, the State legislature also requires that grand juries each year "inspect the condition and operations of the county jail," O.C.G.A. § 15-12-71(b)(1), and "the offices of the district attorney at least once in every three calendar years."  Id.  The grand jury "may prepare reports or issue presentments based upon its inspections," then filed in the superior court.  O.C.G.A. §§ 15-12-71(b)(3); 15-12-80.  At each annual § 15-12-71(b)(1) inspection, O.C.G.A. § 15-12-78 requires that the grand jury make recommendations regarding heating and ventilation, which the county "shall strictly enforce," and presentments as to the "treatment of the inmates."

[41]We reject the arguments (a) that the State's control over sheriffs represents nothing more than "its role as the seat of legislative power in Georgia" and its "sovereign prerogative to structure local government," (Dissent, Barkett, J., pp. 66-67) and (b) that the State's control over sheriffs is the "the kind of indirect and ultimate control . . . reserved by the state with respect to every state-created entity." (Dissent, Anderson, J. p. 52).  We fully recognize that ultimate control of every state-created entity resides with the State and that the State may destroy or reshape any political subdivision as it sees fit, including the sheriff's office.  The key differences here are that the State of Georgia has structured Sheriff Peterson's office as independent of Clinch County, that the State has vested in Sheriff Peterson specific state functions, that most of Sheriff Peterson's duties relate directly to, and are an integral part of, the State's criminal justice system, and that the State can discipline directly Sheriff Peterson for any misconduct.  That sheriffs act as to state matters (and not as to local government matters) is, in part, why counties, and cities too, have no power, authority, or control over sheriffs.

The third factor in the Eleventh Amendment analysis is where the entity derives its funds. The State funds the annual training of sheriffs, funds the Governor's disciplinary procedure over sheriffs for use of excessive force, and pays for certain state offenders assigned to the county jails under the sheriff's supervision.[42] Thus, state funds are involved to some extent in the particular functions of Sheriff Peterson at issue.

While Clinch County bears the major burden of funding Sheriff Peterson's office and the jail, it is because the State so mandates. By state statutes, Clinch County must (1) maintain the jail structure, (2) appropriate funds for necessities to inmates (such as food, bedding, clothing, electricity, and sanitation) and the salaries of Sheriff Peterson and his deputies, and (3) pay the premium for the Sheriff's official bond. O.C.G.A. §§ 36-9-5; 42-5-2(a); 15-16-20; 45-4-7.

Manders relies on O.C.G.A. § 42-5-2(a), which provides, in part, that "it shall be the responsibility of the governmental unit, subdivision, or agency having the physical custody of an inmate to maintain the inmate, furnishing him food, clothing, and any needed medical and hospital attention."[43] But Manders does not

---

[42]The State pays the county the per diem rate for convicted state offenders in the county jail, and the county, in turn, funds the sheriff's budget. O.C.G.A. § 42-5-50(d); Ga. Comp. R. & Regs. § 125-2-4.02(d). The State requires the county to pay for pre-trial state offenders, but, once convicted, the State pays.

[43]We stress that this case does not involve medical care, which counties have a statutory obligation to provide to inmates in county jails. O.C.G.A. § 42-5-2. See, e.g., Epps v. Gwinnett County, 231 Ga. App. 664, 670 (1998) (Gwinnett County contracted with Prison Health Services, Inc.); Cherokee County v. North Cobb Surgical Assocs., 221 Ga. App. 496, 499 (1996); Macon-

allege that Sheriff Peterson denied him necessities in O.C.G.A. § 42-5-2. Rather,

Manders challenges only Sheriff Peterson's force policy at the jail and the training

and disciplining of his deputies.

Furthermore, Clinch County's financial control is attenuated because (a) the

State mandates Sheriff Peterson's minimum salary and official bond amount, and

(b) Clinch County sets the total budget but cannot dictate how Sheriff Peterson

spends it. The Georgia Supreme Court has held that counties "must provide

reasonably sufficient funds to allow the sheriff to discharge his legal duties," and

that "the county commission may not dictate to the sheriff how that budget will be

spent in the exercise of his duties." Chaffin v. Calhoun, 262 Ga. 202, 203-04

(1992);[44] see Boswell v. Bramlett, 274 Ga. 50, 52 (2001). Georgia's Constitution

---

Bibb County Hosp. Auth. v. Houston County, 207 Ga. App. 530, 531-32 (1993) (concluding
Houston County owed hospital for medical care provided to inmate in county jail).

[44]In Chaffin, the county, over the sheriff's objection, shifted the responsibility for
patrolling and drug enforcement to the new county police department and reduced the sheriff's
budget by forty-seven percent. 262 Ga. at 202, 204. The trial court granted the county's request
for an injunction requiring the sheriff to cooperate in the implementation of the plan to transfer
personnel and equipment to the newly created county police department. Id. at 202-03. The
Georgia Supreme Court affirmed, holding that the trial court had not abused its discretion in
finding that the remaining budget was sufficient to allow the sheriff to perform his duties. Id. at
204. In doing so, the Georgia Supreme Court reaffirmed that: (1) "Sheriff Chaffin is an elected,
constitutional officer," Chaffin, 262 Ga. at 203 (citing Ga. Const. art. IX, § 1, ¶ 3(a)); (2) "[t]he
sheriff is not an employee of the county commission," Chaffin, 262 Ga. at 203 (citing Board of
Commissioners of Randolph County v. Wilson, 260 Ga. 482 (1990)); and (3) although the county
commission has the power to create its own county police force, "'the commissioners could not
divest the sheriff of his power and duty to enforce the laws and preserve the peace,'" either
directly or indirectly by exercise of their fiscal authority or control of county property, Chaffin,
262 Ga. at 203 (quoting Wolfe v. Huff, 232 Ga. 44, 45 (1974)).
    In another budget battle between the sheriff and county commission in Board of
Commissioners of Randolph County v. Wilson, the sheriff requested $70,000 to pay deputies, but
the county commission budgeted a lump sum of only $60,080. 260 Ga. at 482. The Georgia

further prevents counties from taking any action affecting any elective county office or the personnel thereof.  Ga. Const. art. IX, § 2, ¶ 1(c)(1).

Payment of Sheriff Peterson's budget, when required by the State, does not establish any control by Clinch County over his force policy at the jail or how he trains and disciplines deputies.[45]  By virtue of State mandates, both state and county funds are involved in the particular functions in issue.  This state involvement is sufficient to tilt the third factor of the Eleventh Amendment analysis toward immunity.

---

Supreme Court held that the county commission did not abuse its authority, viewing the case as "involving the power of the commission to approve the sheriff's budget rather than the power of the sheriff to hire deputies."  Id. at 484.

[45]Alabama sheriffs are elected by county voters, their budgets are paid from county funds, and their jurisdiction is limited to the borders of their respective counties.  The Supreme Court found these factors insufficient to establish county control over sheriffs and decided that Alabama sheriffs act for and represent the State in their law enforcement duties.  See McMillian v. Monroe County, 520 U.S. 781, 791 (1997) ("The county's payment of the sheriff's salary does not translate into control over [the sheriff], since the county neither has the authority to change his salary nor the discretion to refuse payment completely.").  The Supreme Court concluded that the ability of the county governing body to reduce the sheriff's budget as long as the budget remains reasonable results in "attenuated and indirect influence over the sheriff's operations." See id. at 791-92.  Although the analysis required on the Eleventh Amendment question is different from that for a § 1983 policymaker claim, the issue of control under state law is a relevant factor to both inquiries.

After noting that Alabama law cut both ways, the Supreme Court in McMillian concluded that Alabama sheriffs act for the State of Alabama, not the county, and then made this apt observation about Alabama law, which applies equally to Georgia law regulating its sheriffs: "We are not, of course, predicting that state law will always speak with perfect clarity. . . .  It may not be possible to draw an elegant line that will resolve this conundrum." McMillian, 520 U.S. at 793 (quoting Paprotnik, 485 U.S. at 125, 126-27).  This case exemplifies that axiom, and it also explains why we narrowly decide only that Georgia sheriffs in their official capacity act for the State in establishing force policy in the county jail and in training and disciplining their deputies in that regard.

**D.     Liability for and Payment of Adverse Judgments**

The fourth factor is the source of the funds that will pay any adverse judgment against Sheriff Peterson in his official capacity.  Before applying this factor, we discuss three recent cases addressing it.

In Hess v. Port Authority Trans-Hudson Corp., 513 U.S. 30, 35-39 (1994), the Supreme Court denied Eleventh Amendment immunity to an interstate railway-port authority, created under the U.S. Constitution's Interstate Compact Clause and controlled by the federal government and two states.  Because the federal government was one of the "multiple creator-controllers," the five-justice majority in Hess concluded that the states had ceded a portion of their sovereignty to Congress and that having the "Compact Clause" entity respond in federal court did not affront "the dignity" of the states. Id. at 47.  Hess further concluded that "both legally and practically" neither state was obligated to pay any judgment against the entity.  Id. at 51-52.  Rather, the entity was financially independent, with funds from private investors, tolls, fees, and investment income.  Id. at 36, 49-50.  Although weighing this source-of-payment factor heavily, Hess never suggests that for Eleventh Amendment immunity a state treasury drain is required per se and Hess notes that "current Eleventh Amendment jurisprudence

39

emphasizes the integrity retained by each State in our federal system." Hess, 513 U.S. at 39.[46]

The focus of the Supreme Court in Regents of the University of California v. Doe, 519 U.S. 425, 430-31 (1997), was on "potential legal liability" and "the risk of adverse judgments," as opposed to requiring that state funds actually pay the judgment. In Regents, the federal government indemnified a state university, and the litigation had "no impact" on the state treasury. Id. Nevertheless, the Supreme Court determined that this full indemnity did not affect the university's immunity. Id. The Supreme Court emphasized that "[t]he Eleventh Amendment protects the State from the risk of adverse judgments even though the State may be

---

[46]It is at the outset of its opinion in Hess that the Supreme Court discusses "current" Eleventh Amendment jurisprudence and its emphasis on "the integrity retained by each State in our federal system." Hess, 513 U.S. at 39. The Eleventh Amendment's role historically was to protect the State's treasury from federal courts forcing the State to repay war debts. Id. The Court in Hess discussed the state treasury factor but only after first concluding that "[s]uit in federal court is not an affront to the dignity of a Compact Clause entity, for the federal court, in relation to such an enterprise, is hardly the instrument of a distant, disconnected sovereign; rather, the federal court is ordained by one of the entity's founders." Id. at 41. The Supreme Court continued its focus on the importance of the sovereign integrity of the State under the Eleventh Amendment and pointed out why the States' integrity was not compromised when a Compact Clause entity is sued in federal court, stating:

> Nor is the integrity of the compacting States compromised when the Compact Clause entity is sued in federal court. As part of the federal plan prescribed by the Constitution, the States agreed to the power sharing, coordination, and unified action that typify Compact Clause creations. Again, the federal tribunal cannot be regarded as alien in this cooperative, trigovernmental arrangement.

Id. at 41-42. The Supreme Court further stressed that "federal courts are not alien to a bistate entity Congress participated in creating." Id. at 47.

The Court in Hess focused on the state treasury factor, but only after it concluded that the sovereign integrity of the State was not implicated when a Compact Clause entity is sued in federal court. In stark contrast, because sheriffs act for and represent the State, not the county, in promulgating force policy at the jail, the State's integrity is heavily involved in this case.

indemnified by a third party," and "it is the entity's potential legal liability, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance, that is relevant." Id. at 431.[47]

Thereafter, this Court applied these principles in Shands Teaching Hospital and Clinics, Inc. v. Beech Street Corp., granting immunity to private corporations that contracted with the state to administer its health insurance program and to provide a network of medical services. 208 F.3d at 1310-11, 1313. We stated that "although these are private corporations that are neither controlled nor funded by the state, they are protected by governmental immunity when they are clearly acting as agents of the state." Id. at 1311. Noting that other circuits had not adopted an approach of total or no immunity, Shands looked to the relief sought and whether the judgment against the private corporation "would implicate the state treasury or interfere with the administration of [a] state . . . program." Id. Given that the State could be sued for the negligence of the agent corporations in untimely paying claims, we determined that the judgment against the private

---

[47]Other than Regents and Hess, the only other recent Supreme Court discussion of the "arm of the State" doctrine in the Eleventh Amendment context is a footnote in Auer v. Robbins, 519 U.S. 452 (1997). In Auer, the Supreme Court concluded that the St. Louis Board of Police Commissioners was not an arm of the state: although the Governor appointed four of the five members, "the city of St. Louis is responsible for the board's financial liabilities" and "the board is not subject to the State's direction or control in any other respect." Id. at 456 n.1. In contrast to Auer, Clinch County is not liable for Sheriff Peterson's acts, is not required to pay judgments against the Sheriff, and the State directs and controls the Sheriff in many respects.

corporations "would implicate state funds" and that the private corporations would indemnify the state was immaterial. Id. at 1313.

Applying these principles to this case, we first determine that under Georgia law Clinch County would not pay a damages award against Sheriff Peterson. Georgia courts speak with unanimity in concluding that a defendant county cannot be held liable for the tortious actions or misconduct of the sheriff or his deputies and is not required to pay the resulting judgments.[48] Likewise, Georgia courts have concluded that counties are not liable for, and not required to give sheriffs money to pay, judgments against sheriffs in civil rights actions. See Wayne County Bd. of Comm'rs v. Warren, 236 Ga. 150, 152 (1976) ("[A] county has no liability in connection with the violations of the civil rights of any person by a county officer."). The Georgia Supreme Court in Warren quoted a Georgia statute stating that "[a] county is not liable to suit for any cause of action unless made so

---

[48]Wayne County Bd. of Comm'rs v. Warren, 236 Ga. 150, 152 (1976) (concluding that a county has no liability for the violations of the civil rights of any person by a county sheriff); Brown, 221 Ga. App. at 201 (reversing denial of summary judgment for Peach County because the Peach County sheriff, not Peach County, was the proper party to sue and noting that deputy sheriffs "were employees of the sheriff and not Peach County"); Lowe v. Jones County, 231 Ga. App. 372, 373 (1998) (concluding "deputy sheriffs are employees of the sheriff, not the county, and the county cannot be held vicariously liable as their principal"); Pettus v. Smith, 174 Ga. App. 587, 588 (1985) (affirming summary judgment for county board of commissioners and concluding, "[a]s the county commissioners had no control over the official duties of the deputy sheriff . . . , they had no duty to determine whether a high-speed driving course rather than a defensive driving course was reasonably required to be supplied to deputy sheriffs"); Chadwick v. Stewart, 94 Ga. App. 329, 329-30 (1956).

by statute." Id. at 151 (quotation marks omitted).[49] Thus, by statute, the county was not liable. In addition, the Georgia Supreme Court concluded that "there is no duty of the county to furnish the sheriff with money to settle a civil rights judgment entered against him." Id. at 152.[50]

Although Clinch County is not required to pay and although Sheriff Peterson argues that "the 'legal liability' for sheriffs in Georgia rests with the State of Georgia, not individual counties," we can locate no Georgia law expressly requiring the State to pay an adverse judgment against Sheriff Peterson in his official capacity. Sheriff Peterson thus apparently would have to pay any adverse federal court judgment against him in his official capacity out of the budget of the

---

[49] The statute quoted in Warren is former Georgia Code § 23-1502 (1933), which is now O.C.G.A. § 36-1-4. In the subsequent decision of Chatham County Commissioners v. Rumary, 253 Ga. 60 (1984), the Georgia Supreme Court held that the Chatham County Board of Commissioners was required to pay a judgment against a deputy sheriff for damages in an automobile collision because Chatham County's own Code provided for the defense of the deputy at trial and payment of final judgments awarded in courts. Id. at 60-61. The Georgia Supreme Court emphasized that "[t]he nature of the [county] Board's liability here is not that of respondeat superior [for the deputy sheriff's acts], but exists solely by virtue of its voluntary and self-imposed obligation to provide indemnification for the acts of its employees committed during the performance of their duties." Id. at 61. No evidence in this case suggests that Clinch County voluntarily has agreed to provide indemnification to Sheriff Peterson or his deputies. Further, the Supreme Court has instructed that indemnification does not remove the cloak of immunity. Regents, 519 U.S. at 430-31.

[50] Haywood v. Hughes, 238 Ga. 668 (1977), has been cited for the proposition that counties, by statute, are authorized to pay for the sheriff's legal costs in civil rights suits by third parties against sheriffs. See O.C.G.A. § 45-9-21. In Haywood, however, the Georgia Supreme Court emphasized that the statute authorizes counties to do so "in their discretion" and "give[s] the county considerable latitude in determining what actions will be defended." Id. at 669 (citing Ga. Code Ann. § 89-945, which is now O.C.G.A. § 45-9-21). In Haywood, the Glascock County Commissioners adopted a policy to pay attorney's fees in two specific suits against the sheriff. Id. Haywood demonstrates that Clinch County is not required to pay the sheriff's attorney's fees unless it elects to do so.

sheriff's office.  In turn, this payment would reduce his budget, and the practical

reality is that Sheriff Peterson must recoup that money from somewhere.  If a

significant adverse judgment occurs, both county and state funds are implicated

because Sheriff Peterson would need to seek a greater total budget from the county

for his office and a greater daily rate from the State for felony offenders serving

their state sentences in the county jail.

Never has the Supreme Court required an actual drain on the state treasury

as a per se condition of Eleventh Amendment immunity.[51]  See Regents of the

Univ. of Cal. v. Doe, 519 U.S. 425; Hess, 513 U.S. 30; Shands, 208 F.3d 1308.

This is because the Eleventh Amendment "is rooted in a recognition that the

States, although a union, maintain certain attributes of sovereignty," and a purpose

of the Eleventh Amendment is to "accord[] the States the respect owed them as

members of the federation" and not to affront the "dignity" or "integrity" of a state

---

[51]Hess says that the state treasury factor is a "core concern" of Eleventh Amendment jurisprudence.  513 U.S. at 51.  It is true that the presence of a state treasury drain alone may trigger Eleventh Amendment immunity and make consideration of the other factors unnecessary.  Thus, this is why some decisions focus on the treasury factor.  If the State footed the entire bill here, there would be no issue to decide.

The Eleventh Amendment, however, does not turn a blind eye to the state's sovereignty simply because the state treasury is not directly affected.  Moreover, the United States Supreme Court has never said that the absence of the treasury factor alone defeats immunity and precludes consideration of other factors, such as how state law defines the entity or what degree of control the State has over the entity.  As mentioned earlier, although the state treasury was not affected, the Hess Court spent considerable time pointing out how that lawsuit in federal court did not affect the dignity of the two States because they had ceded a part of their sovereignty to the federal government as one of the creator-controllers of the Compact Clause entity in issue.  If the state-treasury-drain element were always determinative in itself, this discussion, as well as the other control discussion, would have been unnecessary.  See supra note 46.

by requiring a state to respond to lawsuits in federal courts. Hess, 513 U.S. at 39-40 (citation and quotation marks omitted). "[C]urrent Eleventh Amendment jurisprudence emphasizes the integrity retained by each State in our federal system." Id. at 39. The State's "integrity" is not limited to who foots the bill, and, at a minimum, the liability-for-adverse-judgment factor does not defeat Sheriff Peterson's immunity claim.

## V. CONCLUSION

Having applied the Eleventh Amendment factors, we conclude that Sheriff Peterson in his official capacity is an arm of the State, not Clinch County, in establishing use-of-force policy at the jail and in training and disciplining his deputies in that regard.[52] Therefore, Sheriff Peterson is entitled to Eleventh Amendment immunity in this case.[53] We need not answer, and do not answer,

---

[52]Never before has this Court discussed or decided en banc the particular issue in this case. We think that no panel actually has decided the question before this case. In prior § 1983 cases, we merely accepted official capacity suits against Georgia sheriffs as suits against their respective counties. See, e.g., Alexander v. Fulton County, 207 F.3d 1303, 1322 n.14 (11th Cir. 2000); Wayne v. Jarvis, 197 F.3d 1098, 1105 (11th Cir. 1999). In these cases, we did not decide whether, under Georgia law, sheriffs are agents for the State or the counties, and it does not appear the parties raised the question. To the extent that our prior decisions state or imply that Georgia sheriffs act for counties regarding the particular functions in issue–force policy and training and disciplining of deputies in that regard–we overrule those decisions.

[53]We are mindful of the Supreme Court's instruction that, before reaching an Eleventh Amendment issue, a court should address "the question [of] whether the statute itself permits the cause of action it creates to be asserted against States." Vermont Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. 765, 779 (2000) (emphasis in original). If sheriffs in their official capacity are arms of the state when exercising certain functions, then an issue arises whether Manders's § 1983 suit is subject to dismissal on the independent ground that they are not "persons" for purposes of § 1983. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989). This statutory issue, however, is not before us as it was neither briefed nor argued on appeal.

today whether Sheriff Peterson wears a "state hat" for any other functions he performs. We conclude only that he does as to the limited functions at issue in this case.

The first two factors weigh heavily in favor of immunity, and the third factor tilts that way as well. Sheriffs' duties and functions are derived directly from the State, performed for the State, and controlled by the State. The State of Georgia has exercised its managerial prerogative: (a) to incarcerate state offenders, pretrial and post-conviction, in county jails, among other locations; (b) to assign sheriffs certain specific state functions in law enforcement, state courts, and corrections, including making sheriffs in charge of state offenders in county jails; (c) to control sheriffs' duties, train sheriffs in those duties, and discipline sheriffs; (d) to preclude any county control over sheriffs but nonetheless require counties to fund the jail structure and sheriffs' budgets; and (e) for the State to pay for sheriffs' training and discipline, as well as certain state offenders in the county jail. Given these principles of Georgia law, we conclude that sheriffs act for the State, not counties, as to the functions in issue.[54]

---

[54]It has been suggested that the sheriff's office is an independent, constitutional, elected office that is neither the State nor the county. (Dissent, Anderson, J., p. 53). Throughout this litigation the parties have briefed and framed the legal issue in this case solely as whether Sheriff Peterson in his official capacity acts on behalf of the State or Clinch County in the context of the Eleventh Amendment. Thus, we decide that controversy. No other issue is before us. In addition, while we agree that the sheriff's office is independent from and not controlled by the county, we conclude today only that the sheriff acts for the State in performing the particular functions at issue in this case.

As to the final fourth factor in the Eleventh Amendment analysis, although the State and the county are not required to pay an adverse judgment against the sheriff, both county and state funds indirectly are implicated. In any event, the State's sovereignty and thus its integrity remain directly affected when federal court lawsuits interfere with a state program or function. At a minimum, this final factor does not defeat immunity.

Accordingly, we reverse the district court's order denying Sheriff Peterson's motion for summary judgment and remand this case to the district court for proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

ANDERSON, Circuit Judge, dissenting, in which TJOFLAT, BIRCH, and WILSON, Circuit Judges, join:

I respectfully dissent. I submit that the opinion for the court misapplies the appropriate Eleventh Amendment analysis. In my judgment, the most favorable face that the sheriff might put on this case would paint this case as similar to Hess v. Port Authority Trans-Hudson Corp., 513 U.S. 30, 115 S.Ct. 394 (1994). In Hess, the "[i]indicators of immunity or the absence thereof do not ... all point the same way," id. at 44, 115 S.Ct. at 402. In this case, the following immunity indicators point against Eleventh Amendment immunity: the sheriff's geographic limitation to a single county, the sheriff's accountability to the electorate of a single county, the state constitution's treatment of sheriffs as county officers and not as state officials, the state's delegation of broad policymaking autonomy to the sheriff as opposed to retaining hands-on control, and the fact that the state has no legal liability and no potential legal liability with respect to judgments against a sheriff. As in Hess, the functions of the sheriff "are not readily classified as typically state or unquestionably local." Id. at 45, 115 S.Ct. at 403. Both states and municipalities engage in law enforcement activities, and in particular in the jailing function.

In my judgment, the second Eleventh Amendment immunity factor – control – is the only one of the four indicators[1] that might provide some support for the majority position.[2] Even assuming *arguendo* that there are immunity indicators pointing in different directions, the Supreme Court has given us clear guidance in such situations: "When indicators of immunity point in different directions, the Eleventh Amendment's twin reasons for being remain our prime guide." Hess, 513 U.S. at 47, 115 S.Ct. at 404. The first of the twin reasons asked whether it would be "disrespectful" or a "threat to the dignity" of the state to require the state to answer the complaint in federal court. Of course, it is well established that an identical claim against a city or a county – i.e., Manders' § 1983 excessive force claim for violating the Eighth Amendment by beating him while in jail – would not be barred by Eleventh Amendment immunity. I see no greater threat to the dignity of the state in the instant suit against the Sheriff of Clinch County.

---

[1]   With respect to the first indicator – how the state defines the Sheriff's Office with respect to the jail function – I agree with most of what Judge Barkett says in her dissent. See Barkett, J., dissenting, at Part I. With respect to the third indicator – the source of defendant's funding – I again agree with most of what Judge Barkett has written. Id. at Part III. With respect to the fourth indicator – the state's liability for adverse judgments – no one has suggested that the state would be liable, and thus this most important factor, this core concern of the Eleventh Amendment, points strongly against immunity. In other words, I agree with most of what Judge Barkett has written, but I specifically decline to join her implication that the county governing body would bear §1983 liability for actions of the sheriff. All we need decide in this case is that the sheriff is not an arm of the state; we need not decide the county's liability vel non.

[2]   Ultimately, I believe even the control factor fails to offer much support for the majority position. The control exercised by the state is simply too indirect and too limited. See brief discussion below, and the fuller discussion in Barkett, J., dissenting, Part II.

The second of the twin reasons which the Supreme Court in <u>Hess</u> held

should guide us is what the Supreme Court characterized as "the <u>impetus</u> for the

Eleventh Amendment: the prevention of federal-court judgments that must be paid

out of a State's treasury." <u>Id.</u> at 48, 115 S.Ct. at 404 (emphasis added). The

Supreme Court also characterized this state treasury factor as "the Eleventh

Amendment's core concern," <u>id.</u> at 51, 115 S.Ct. at 406, and cited with approval

the fact that the vast majority of the circuits have concluded that the state treasury

factor is "the most important factor" to be considered. <u>Id.</u> at 49, 115 S.Ct. at 405.[3]

In applying this analysis, the Supreme Court expressly discounted the

significance of the control factor, stating in relevant part:

> But ultimate control of every state-created entity resides with the
> State, for the State may destroy or reshape any unit it creates.
> "[P]olitical subdivisions exist solely at the whim and behest of their
> State," yet cities and counties do not enjoy Eleventh Amendment
> immunity.

---

[3]    Following <u>Hess</u>, the cases have uniformly continued to consider the state treasury factor as dominant. <u>See</u> <u>Vogt v. Board of Comm'rs</u>, 294 F.3d 684, 689 (5th Cir. 2002) (following <u>Hess</u>, "[the] most significant factor in assessing an entity's status is whether a judgment against it will be paid with state funds") (citation omitted); <u>Streit v. County of Los Angeles</u>, 236 F.3d 552, 567 (9th Cir. 2001) (applying <u>Hess</u>, whether state is financially liable for judgment against sheriff's office for operation of county jail is "the most important factor in identifying an arm of the state"); <u>Harter v. Vernon</u>, 101 F.3d 334, 338-39 (4th Cir. 1996) (observing, in holding that North Carolina sheriff and deputies are not immune, that "when the state treasury will not pay the judgment ... the most salient factor in Eleventh Amendment decisions weighs against a finding of immunity") (internal quotes omitted); <u>Sonnenfeld v. Denver</u>, 100 F.3d 744, 749 (10th Cir. 1996) (citing <u>Hess</u>, "[t]he most important factor in determining whether a governmental entity is entitled to Eleventh Amendment immunity is whether a judgment against it would be paid from the state treasury."); <u>Christy v. Pennsylvania Turnpike Comm'n</u>, 54 F.3d 1140, 1145, 1149-50 (3rd Cir. 1995) (quoting <u>Hess</u>, "the most important factor is whether a judgment against the entity in question ... would be paid out of the state treasury," and holding that there was no Eleventh Amendment immunity despite considerable state control) (internal quotes omitted).

Id. at 47, 115 S.Ct. at 404 (citation omitted). Even more significant, the Court

held:

> Moreover, rendering control dispositive does not home in on the
> impetus for the Eleventh Amendment: the prevention of federal-court
> judgments that must be paid out of a State's treasury.

Id. at 48, 115 S.Ct. at 404. The fact that the control factor was discounted in Hess

is particularly significant for the instant case because the state control in Hess was

much more direct and significant than the control exercisable by the state in the

instant case. At issue in Hess was the Eleventh Amendment status of a bi-state

port authority. The governing body of the port authority, twelve commissioners,

were appointed, six by each state. Id. at 36, 115 S.Ct. at 399. Any vote or action

by the commissioners was subject to a veto by the governor their respective states.

Id. at 37, 115 S.Ct. at 399. Other control was exercisable by the state legislatures.

Id. In Hess, in other words, there was direct control over any and all decisions.

On the other hand, the state control in the instant case is clearly indirect. It

includes delegations of authority; it provides for general standards and

inspections; it reserves for the Governor the power to temporarily suspend a

sheriff for specified misconduct or incapacity, and participation in the process of

removal from office, again for specified misconduct or incapacity. Moreover, the

state control in the instant case is either equally applicable to city and county jails,

or analogous to state control over other local officers. In short, the state control

here is precisely the kind of indirect and ultimate control which the Supreme Court

in Hess discounted as being reserved by the state with respect to every state-

created entity. Id. at 47, 115 S.Ct. at 404 ("But ultimate control of every state-

created entity resides with the State.").[4] Thus, if state control was not sufficient to

warrant Eleventh Amendment immunity in Hess, I cannot conclude that it is in the

instant case.[5] I respectfully submit that the opinion for the court overemphasizes

the control factor and underemphasizes the state treasury factor. With respect to

the latter, it is clear that the state treasury is not obligated to pay adverse

judgments against the sheriff. In this respect too, the instant case is even clearer

than Hess.[6]

---

[4] Justice O'Connor's dissent in Hess would have placed greater weight on the control factor, but only on "real, immediate control and oversight, rather than on the potentiality of a State taking action to seize the reins." See id. at 62, 115 S.Ct. at 411 (O'Connor, J., dissenting). It is doubtful that the state's control in the instant case would satisfy Justice O'Connor's standard.

[5] Although the control factor is relevant both in the policymaker inquiry for § 1983 purposes and in the Eleventh Amendment inquiry, control is a more significant factor in the § 1983 inquiry. Compare Turquitt v. Jefferson County, Alabama, 137 F.3d 1285, 1292 (11th Cir. 1998) (en banc) ("Local governments can never be liable under §1983 for the acts of those whom the local government has no authority to control.") with Hess, 404 U.S. at 47-48, 115 S.Ct. at 404 (discounting the control factor as above discussed). For this reason, as well as the primacy for the Eleventh Amendment of the state treasury factor, the § 1983 caselaw should be used only cautiously in an Eleventh Amendment analysis.

[6] Nothing in Regents of the Univ. of Calif. v. Doe, 519 U.S. 425, 117 S.Ct. 900 (1997), suggests a contrary result here. In Doe, the Court framed the core Eleventh Amendment question as whether an adverse judgment would expose the state to "potential" legal liability, even if some coverage mechanism existed to indemnify the state against actual liability. Id. at 431, 117 S.Ct. at 904. There is no suggestion here that the state is liable for judgments against sheriffs in any fashion, real or potential.

In sum, I submit that, at best, the other immunity indicators point in different directions. As in <u>Hess</u>, we should therefore look to the "twin reasons" for guidance. I submit that these reasons point against Eleventh Amendment immunity, and indeed more strongly so than in <u>Hess</u>.

In addition to the inappropriate emphasis discussed above, I also respectfully disagree with the opinion for the court in another respect. In my judgment, it asks the wrong question. It asks who has the most control, the state or the county. I submit that the proper question is whether the sheriff has carried his burden of proving that he is an arm of the state. In other words, the issue is not the state versus the county; rather, the issue is whether the sheriff is an arm of the state *vel non*. The mere fact that the sheriff is not the policymaker for the county commission, is not controlled by the county commission, and the fact that the county has no *respondeat superior* liability for judgments against the sheriff, do not, either singly or in combination, go very far toward establishing that a Georgia sheriff is an arm of the state. The Seventh Circuit recognized this in <u>Franklin v. Zaruba</u>, 150 F.3d 682 (7th Cir. 1998). There, in holding that an Illinois sheriff was not entitled to Eleventh Amendment immunity, the court said:

> According to defendants, if sheriffs in Illinois are not agents of the county for purposes of holding the county liable under *respondeat superior*, then sheriffs must therefore be agents of the state. This argument overlooks a crucial third possibility ... – namely, that the sheriff is an agent of the county sheriff's department, an

independently-elected office that is not subject to the control of the county in most respects.

Id. at 685.  The court held that the fact that "the county is not liable under *respondeat superior* for the actions of the sheriff does not necessarily entail that the sheriff must necessarily be an agent of the state."  Id. at 686.  Similarly, in Hess, there was no attempt to assign responsibility for the bi-state authority to some level of government other than the state.  It was sufficient there, as it should be here, to say that defendant is not an arm of the state.

For the foregoing reasons, I respectfully dissent.

BARKETT, Circuit Judge, dissenting, in which TJOFLAT, BIRCH, and WILSON, Circuit Judges, join, and in which ANDERSON, Circuit Judge, joins in part:

Willie Santonio Manders sued Clinch County Sheriff Winston Peterson under 42 U.S.C. § 1983 for injuries Manders sustained when officers under Sheriff Peterson's supervision struck him repeatedly in the face and bashed his head against a wall in the Clinch County Jail. According to Manders's deposition testimony, the beating he sustained upon his arrival at the county jail eventually resulted in his admission to a mental hospital.

In Georgia, county jails such as the one where Manders was held are quintessentially local institutions that exist separate and apart from the state's integrated system of prisons. Their operation is among the responsibilities of the county and, specifically, the county sheriff. Longstanding authority clearly establishes that local governments such as counties may be held liable under 42 U.S.C. § 1983 for policies they adopt or customary practices they tolerate in operating local governmental facilities. See Jinks v. Richland County, 123 S. Ct. 1667, 1673 (2003) (unanimous opinion); Monell v. New York City Dep't of Social Servs., 436 U.S. 658 (1978).[1] In the past, therefore, plaintiffs such as Manders

_____

[1]Thus we and our sister circuits have previously held, correctly in my view, that claims against sheriffs in their official capacity for constitutional violations at county jails are claims against the relevant county. See, e.g., Wayne v. Jarvis, 197 F.3d 1098, 1105 (11th Cir. 1999) (stating that jail inmate's § 1983 "claim against Sheriff Jarvis in his official capacity is a claim against DeKalb County"); see also Streit v. County of Los Angeles, 236 F.3d 552, 564 (9th Cir. 2001); DeGenova v. Sheriff of DuPage County, 209 F.3d 973, 977 (7th Cir. 2000); Doe By and Through Doe v. Washington County, 150 F.3d 920, 923-24 (8th Cir. 1998); Dotson v. Chester,

55

could be confident that violations of their constitutional rights in county jails would not go unremedied.

Today, however, the majority badly subverts the law of local governmental liability by holding that county sheriffs in Georgia act for the state, and thus are immune from suit by operation of the Eleventh Amendment, when they exercise policy-making authority over county jails. It reaches this conclusion by determining that even if Sheriff Peterson's policies were responsible for inmate Manders's beating, Peterson adopted these polices not in his role as jailer, but in carrying out the previously unknown "functions" of "establishing use-of-force policy at the jail and . . . training and disciplining his deputies in that regard." Majority Opinion at 2.

When confronted in the past with § 1983 claims based on a jail inmate's treatment while in custody, we have always defined the relevant function as "operating a county jail." See Turquitt v. Jefferson County, 137 F.3d 1285, 1288 (11th Cir. 1998) (en banc); see also Marsh v. Butler County, 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc) (quoting Turquitt); Lancaster v. Monroe County, 116 F.3d 1419, 1428 (1997). This has been our practice for good reason. The point of identifying the pertinent governmental function in each case is to keep our analysis focused on the discrete set of positive state law authorities that define the

937 F.2d 920, 934 (4th Cir. 1991); Blackburn v. Snow, 771 F.2d 556, 571 (1st Cir. 1985).

56

particular area of official responsibility at issue. Cf. McMillian v. Monroe

County, 520 U.S. 781, 786 (1997) (requiring analysis of the "particular area" at

issue and contrasting it with a "categorical, 'all or nothing'" approach); City of St.

Louis v. Praprotnik, 485 U.S. 112, 125 (1988) (expressing confidence that state

law will provide sufficient guidance when inquiry is focused on a "given area of a

local government's business"). This analytical purpose is inevitably frustrated if

the notion of function is conflated with what is more properly deemed a general

attribute of the defendant's office, incidental to a range of official functions. Once

our inquiry becomes tied to an attribute that is at issue in a variety of contexts, we

face the danger of a sprawling inquiry spanning the whole corpus of state law.

Such is the case here. At bottom, the majority's newly invented "function"

is nothing more than the sheriff's lawful authority to use force. This power is

implicated, at a greater or lesser degree of remove, in virtually all of a sheriff's

areas of official responsibility. It is not a function but rather a general attribute of

the sheriff's office.

By defining "function" in its unprecedented fashion, the majority dispenses

with the guidance to be found in Georgia statutes clearly directing that Sheriff

Peterson manages the Clinch County Jail for Clinch County.[2] It then fails to locate

---

[2]Since 1863, the Georgia Code has provided that sheriffs are "Jailers of the counties."
Ga. Code § 331 (1863). Today, it provides that "sheriffs are jailers of the counties and have the
authority to appoint other jailers, subject to the supervision of the county governing authority."
Ga. Code Ann. § 42-4-1(a) (1997). Moreover, it is counties that have the "physical custody" of

any equally clear authority addressing the question we must decide today. No guidance is to be found in the statute identifying circumstances under which sheriffs may deploy force, because this enactment establishes only that the same authority extends to state <u>and local</u> governmental actors alike. <u>See</u> Ga. Code Ann. § 17-4-20(d) (prohibiting either a "law enforcement agency of this state <u>or of any political subdivision of this state</u>" from limiting peace officers' authority to use force) (emphasis added); <u>Perry v. State</u>, 419 S.E.2d 922, 924 (Ga. Ct. App. 1992) (defining scope of sheriff's arrest power by way of Ga. Code Ann. § 17-4-20). Instead, the majority rifles through the rest of the Georgia Code, drawing indirect inferences from statutes addressing everything from registration of bail-bond sureties to execution of court process. In the course of its effort to integrate these state laws into a sort of unified theory of Georgia sheriffs, the majority deploys two arguments that misstate the law and have implications of tremendous breadth.

First, the majority suggests that sheriffs are entitled to Eleventh Amendment immunity because their authority to use force is conferred by the state. <u>See</u> Majority Opinion at 29. This logic marks a blatant end-run around our function-by-function approach. As the majority itself points out, sheriffs may exercise force "in initial arrests, in subduing inmates in sessions of state superior courts, or in quelling disruptive inmates in county jails." <u>Id.</u> If sheriffs are state agents

---

inmates in their jails and are therefore bound to "maintain" them, as by furnishing "food, clothing, and any needed medical and hospital attention." <u>Id.</u> § 42-5-2(a).

simply because their authority to use force originates in state law, then it must be they act as state agents whenever engaged in a capacity that requires the deployment of force – which is to say, in virtually every function sheriffs have traditionally served.

Even more radically, this argument implies that Eleventh Amendment immunity extends beyond sheriffs to city police officers, county police officers, and even private security guards. All of these individuals, from the Chief of the Atlanta Police Department to the employee keeping watch over the cosmetics aisle of a department store, act on authority vested in them by state law when using force to effectuate arrests for violations of state law. See Allen v. City of Atlanta, 510 S.E.2d 64, 66 (Ga. Ct. App. 1998) (striking down city police department's policy governing officers' discharge of their firearms on basis of conflict with Ga. Code Ann. § 17-4-20); Ga. Code Ann. § 36-8-5 (authorizing arrest by county police); id. § 17-4-60 (authorizing arrest by private parties); Cash v. State, 221 S.E.2d 63, 64 (Ga. 1975) (approving store security officer's arrest of shoplifter). Yet it is settled law that city police, county police, and security guards hired by private entities are not entitled to Eleventh Amendment immunity. City of Canton v. Harris, 489 U.S. 378, 388 (1989); Pembaur v. City of Cincinatti, 475 U.S. 469, 473-74, 484-85 (1986); Farred v. Hicks, 915 F.2d 1530, 1532-33 (11th Cir. 1990).

The majority proffers no test to distinguish these officers and individuals from the county sheriffs whose exercise of force it newly designates a state function.[3]

The second untenable argument offered by the majority is that the sheriff is entitled to Eleventh Amendment immunity simply because the General Assembly defines the powers and duties of his or her office. Yet on this theory of what makes a public office an "arm of the state" immune from suit, Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977), there can be no such thing as local government, because all local government is by definition a creature of the state's authority to attach powers and duties to particular offices. Indeed, as I shall discuss at greater length below, the Georgia Constitution authorizes the state legislature to define the powers and duties of the very officials most readily associated in Georgia with policy-making on behalf of local governments: county commissioners. To hold that county commissioners are entitled to Eleventh

_____

[3]To be sure, the majority endeavors to articulate such a distinction by stating that "[a] city delegates and exercises its policing function through its city police officers and a county through county police officers," whereas "the State delegates and performs certain state policing and corrections functions through several law enforcement agencies, including sheriffs. . . ." Majority Opinion at 30 n.35. This purported distinction presupposes an answer to the very question at issue in this appeal, namely, whether county sheriffs in Georgia act for the state. Because the analysis by which the majority reaches its affirmative answer rests in part on an attribute common to all peace officers in Georgia – namely, the conferment by state law of a power to effect arrests by force – it would seem to follow that not only sheriffs but also city and county police officers could be regarded as state actors. Apparently this is not so. While the majority's distinction escapes me, I certainly agree that city and county police officers do not generally act as arms of the state, and thus I am reassured by today's promise that the "hypothetical scenarios" raised by the majority's reasoning will remain, after all, merely hypothetical. Majority Opinion at 30 n.35.

Amendment immunity plainly flouts established law. Nonetheless, this is precisely what the majority implies today.

In the end, identifying "force policy" as the function at issue in this case so broadens the inquiry required in applying the Eleventh Amendment that the majority's opinion becomes a largely ad hoc survey of the Georgia Code. When we instead recognize jail operation as the proper focus of our inquiry, every relevant factor straightforwardly weighs against the conclusion that Sheriff Peterson, in carrying out this function, acts as an "arm of the state" such that the Eleventh Amendment immunizes him from suit in federal court.

## I. DEFINITION OF SHERIFF'S OFFICE AND JAILS UNDER STATE LAW

The first factor relevant in our application of the Eleventh Amendment is how state law defines the entity or official sued as a defendant. We have previously found this factor to favor holding a sheriff unprotected by the Eleventh Amendment when the state constitution, as interpreted by the state supreme court, established that the "sheriff is a 'county official' and, as such, is an integral part of the 'county.'" Hufford v. Rodgers, 912 F.2d 1338, 1341 (11th Cir. 1990) (citation omitted).

The Georgia Constitution is unequivocal in its designation of sheriffs as "county officers." Ga. Const. art. 9, § 1, ¶ 3. I have discussed the relevant provision and its history at some length in Grech v. Clayton County, ___ F.3d ___

(Barkett, J., concurring). Rather than revisit that discussion in full, I here note simply that the language, structure, and history of the Georgia Constitution overwhelmingly demonstrate an intent on the framers' part to ratify more than one hundred years of Georgia case law recognizing the sheriff's independence from state lawmakers. Indeed, the drafters resoundingly rejected a suggestion that would have given the state legislature the power to decide whether the sheriff's office would exist and by whom it could be filled. Id. at 10 n.8 (Barkett, J., concurring). This designation of sheriffs as independent county officers militates against considering them arms of the state in any of their official functions.

With respect to the particular sheriff's function we must consider in this case, statutory law defining jails as county institutions perfectly complements the constitution's definition of the sheriff's office. "By virtue of their offices, sheriffs are jailers of the counties and have the authority to appoint other jailers, subject to the supervision of the county governing authority, as prescribed by law." Ga. Code Ann. § 42-4-1(a). A county "having the physical custody of an inmate" has the responsibility:

> to maintain the inmate, furnishing him food, clothing, and any needed medical and hospital attention; to defend any habeas corpus or other proceedings instituted by or on behalf of the inmate; and to bear all expenses relative to any escape and recapture, including the expenses of extradition.

Id. § 42-5-2(a). As governmental units charged with the custody of persons accused of crimes, counties maintain their jails through the efforts of their sheriffs. In performing this function, sheriffs cannot be decreed the arms of the state.

In order to reach a contrary conclusion, the majority finds it necessary to set aside the Georgia Constitution's general characterization of sheriffs as county officers and the Georgia Code's identification of jails as county institutions. To this end, it deploys its novel concept of "function" to distinguish the present case from one involving the duties specifically enumerated in Section 42-5-2(a), namely, "feeding, clothing, or providing medical care to inmates." Majority Opinion at 29. In the majority's view, these duties and the sheriff's broader responsibility "to maintain" inmates are not implicated in this case because here we must consider not jail operation per se, but rather "Sheriff Peterson's force policy, which happens to be at issue in the jail context . . . ." Id. at 30. A focus on "force policy," however, does not identify any state law that illuminates the state or local character of this "function" as clearly as do statutes vesting counties with responsibility for jails. Rather, as already discussed, the Georgia statute authorizing sheriffs to use force sheds no light whatsoever on whether the sheriff acts for the state or the county in doing so.

The majority compensates for this lack of direct guidance by turning to "the specific duties the State assigns to sheriffs," "most" of which it regards as

"integral" to the "State's criminal justice system." Id. at 28-29. In this connection, the majority discusses "state court and bond-related duties," id. at 20, as well as "the common law duties of sheriffs to enforce the laws and preserve the peace on behalf of the sovereign State." Id. at 15.[4] The problem with this approach is that law enforcement, court, and bond-related duties have nothing to do with the function at issue in this case, even on the majority's definition of that function as "establishing use-of-force policy at the jail." The beating to which Manders alleges he was subjected was neither connected with his arrest, which had already been effected by the time he entered the Clinch County Jail, nor incident to his transport to or from a courtroom.[5]

_____

[4]The majority also points to sheriffs' duty to detain certain prisoners in county jails for a limited period after they have been committed to state custody. Majority Opinion at 30; id. at 23-24. Assuming for purposes of argument that to this extent state law does define sheriffs as "arms of the state," the point has little force in this case. First of all, Manders was not committed to state custody at any point during his detention at the Clinch County Jail. Second, the special categories of prisoners discussed by the majority – consisting mainly of persons appealing conviction, awaiting imposition of suspended sentence, or serving previously probated sentences revoked on the basis of minor offenses – are clearly minor exceptions to the general rule. In operating a jail, the sheriff exercises custody primarily over pretrial detainees and persons convicted of misdemeanors. With respect to these much broader categories of prisoner, it is the county rather than the state that is responsible for the detention and well-being of persons in the sheriff's custody. Ga. Code Ann. § 42-5-51. I discuss below the one other category of prisoners specially singled out by the majority: persons whom the Georgia Department of Corrections temporarily pays counties a per diem fee to house due to overcrowding in state prisons. See infra note 11.

[5]Remarkably, the majority goes so far as to suggest at one point that detaining accused criminals is always and everywhere a "state function" whenever offenders are charged with "state felonies." See Majority Opinion at 27 n.33. The reasoning appears to be that the enactment of state laws defining felony offenses makes all persons charged with the commission of a felony "state offenders," and accordingly entitles their custodians to Eleventh Amendment protection from at least some suits. This infirm logic marks a variation on the argument that Sheriff Peterson is entitled to Eleventh Amendment immunity whenever he exercises his authority under

64

Hence the majority's refusal to recognize jail operation as the pertinent function in this case ultimately becomes a license to dispense entirely with the function-by-function approach we apply in deciding claims of Eleventh Amendment immunity. Instead, the majority offers an ad hoc collection of Georgia laws pertaining not to jail operation, nor even to the function it has newly invented, but rather to the sheriff's "essential governmental nature."[6] Majority Opinion at 28. This looks very much like the "all or nothing" approach against which the Supreme Court has warned. See McMillian, 520 U.S. at 785 (instructing that the question of whether a sheriff acts for the county or state

---

state law to use force in making arrests. Just as the majority's reliance on Georgia's use-of-force statute implies that every sheriff, city police officer, and store security guard must be a state actor, so its discernment of a "state function" from the mere existence of state penal codes implies that every one of this country's jails, detention units, and holding cells must be a state institution. That implication defies the longstanding amenability of local governments to suit for violating the constitutional rights of persons held in local jails on state charges. See, e.g., Jinks, 123 S. Ct. at 1673 (stating that claim arising out of prisoner's death in county detention facility lay against "a political subdivision" of the state, rather than state itself, when prisoner had been arrested for failing to pay child support); Goodson v. City of Atlanta, 763 F.2d 1381, 1387-88 (11th Cir. 1985) (upholding award of $45,000 in damages against city of Atlanta for conditions of confinement suffered by plaintiff while detained in Atlanta City Jail on charge of rape).

[6]Plainly baffling, then, is the majority's charge that this dissent, in taking jail operation as the pertinent function, "defines the Sheriff's conduct at a higher level of abstraction" than the majority itself. Majority Opinion at 8 n.9. Divination of the sheriff's "essence" would seem to involve abstraction of a very high order. By contrast, the concrete function of jail operation focuses our inquiry on positive state legal authority directly relevant to this case, namely, the Georgia statute that makes sheriffs "jailers of the counties." Ga. Code Ann. § 42-4-1(a).

The majority recognizes that counties may be liable for constitutional deprivations arising out of certain aspects of jail administration. See Majority Opinion at 34, 36 & n.43 (distinguishing Manders's suit from one involving provision of "food, clothing, and any needed medical and hospital attention" to jail detainees, as required under Ga. Code Ann. § 42-5-2(a)). While I agree with the majority that counties are responsible for providing prisoners with these basic necessities, I believe their responsibility extends much more broadly to all aspects of operating county jails.

requires attention to the sheriff's role "in a particular area, or on a particular issue").

The majority also seeks to minimize the importance of statutes making sheriffs responsible for county jails by emphasizing that this responsibility devolves upon sheriffs by way of state law. See Majority Opinion at 21 (discussing statutory and doctrinal authority establishing that sheriff is required by law to administer jails). In this connection, it contrasts the General Assembly's authority to enact legislation pertaining to sheriffs, see Ga. Const. art. 9, § 1, ¶ 3(a), with the county commission's lack of authority to enlarge or restrict the sheriff's charge.[7] See Ga. Const. art. 9, § 2, ¶ 1(c)(1). The General Assembly's authority to alter the powers and duties attaching to the sheriff's office, however, indicates nothing more than its role as the seat of legislative power in Georgia. Put another way, the Assembly's general authority to define the sheriff's office is a

_____

[7]The majority likewise emphasizes Georgia cases stating that the sheriff is "not an employee of the county commission." Wilson v. Board of Comm'rs of Randolph County, 396 S.E.2d 903, 903 (Ga. 1990) (emphasis added); see also Boswell v. Bramlett, 549 S.E.2d 100, 102 (Ga. 2001) (explaining that employees of "constitutionally elected officers of a county," such as sheriffs, are not employees of the county "as represented by the local governing authority"). It then reads this authority for the very different rule that the sheriff is not an employee of the county. Majority Opinion at 29. That interpretive leap finds no support in Georgia law. As I discuss below, see infra note 15, Georgia law establishes that sheriffs are constitutional county officers independent of county commissions. This independence does not unfasten sheriffs from local government, but rather vests them with final policy-making authority over those county functions entrusted to their office. That sheriffs are not employees of county commissions reflects nothing more than this separation of powers.

66

separate matter from our present concern with whether the laws it has enacted do in fact define the sheriff as an arm of the state.[8]

The majority's neglect of this distinction is at the core of an argument that proves far too much. Not only sheriffs but all forms of "elective county office" are subject to the state's sovereign prerogative to structure local government. Ga. Const. art. 9 § 2, ¶ 1(c)(1); see also, e.g., Ga. Code Ann. § 36-64-5 (requiring that local parks boards established by "the governing body of any county or municipality. . . shall consist of a minimum of five persons and a maximum of nine persons, serving without pay," and that generally the "terms of office of the members of the board shall be for five years"); id. § 36-74-5 (setting forth requirements for appointment, membership, compensation, and organization of local code enforcement boards). This is true of local government not only in Georgia but across this country. Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 47 (stating that "political subdivisions exist solely at the whim and behest of

---

[8]The majority explicitly recognizes that "ultimate control of every state-created entity resides with the State and that the State may destroy or reshape any political subdivision as it sees fit." Majority Opinion at 35 n.41. It then maintains that this elemental form of state sovereignty is not the sole basis for its conclusion that Georgia law defines Sheriff Peterson as a state officer. Yet the majority's discussion relies first, foremost, and throughout on the clauses of the Georgia Constitution cited above, which provide simply that (1) the state's General Assembly may legislate on matters pertaining to the elective county office of sheriff and (2) county commissions may not so legislate. See Majority Opinion at 10 (citing Ga. Const. art. 9, § 1, ¶ 3(a), which provides that sheriffs, along with other county officers, "shall have such qualifications, powers, and duties as provided by general law"); id. at 11, 13, 37-38 (citing Ga. Const. art. 9, § 2, ¶ 1(c)(1), which provides that county commissions' powers "shall not be construed to extend to. . . [a]ction affecting any elective county office"). Those provisions do no more than articulate, with respect to elective county offices, precisely the elemental form of state sovereignty which the majority insists is not the basis of its argument.

their State" (internal quotation and alteration marks omitted)); City of Trenton v. New Jersey, 262 U.S. 182, 187 (1923) ("A municipality is merely a department of the state, and the state may withhold, grant or withdraw powers and privileges as it sees fit." (footnote and citation omitted)).

Indeed, the General Assembly may enlarge or contract the powers and duties not only of the sheriff, but also of the very institution most readily conceived as a repository of local policy-making authority in Georgia: the county governing authority, which in Clinch County is its board of commissioners. See 1933 Ga. Laws § 29, p. 467. Article Nine of the Georgia Constitution, which vests county commissioners with certain "home rule" powers, makes clear that this delegation "shall not restrict the authority of the General Assembly by general law to further define this power or to broaden, limit, or otherwise regulate the exercise thereof." See Ga. Const. art. 9, § 2, ¶ 1(a). Accordingly, the General Assembly has created numerous duties on the part of commissioners. County commissioners must satisfy minimum training requirements, avoid conflicts of interest when purchasing goods and property for the county, and comply with certain disclosure and recusal rules when zoning actions come before them. See Ga. Code Ann. §§ 36-20-4, 36-1-14, 36-67A-2. Myriad other duties structure the county commission's collective discharge of official functions. See, e.g., id. § 36-1-25 (requiring that official minutes be kept of all meetings); id. § 36-67-3 (requiring that official review of zoning proposals address six statutorily specified matters);

id. § 36-9-3 (requiring that sales of real property be made to "the highest responsible bidder, either by sealed bids or by auction after due notice has been given").  Finally, the matters over which county commissions exercise legislative powers are those which state law entrusts to the counties' home rule authority.  See Stephenson v. Board of Comm'rs of Cobb County, 405 S.E.2d 488, 489 (Ga. 1991); Mobley v. Polk County, 251 S.E.2d 538, 541 (Ga. 1979) ("Neither the counties of this state nor their officers can do any act, make any contract, nor incur any liability not authorized by some legislative act applicable thereto.").

If the enactment of laws making sheriffs responsible for jails entitles the sheriff to Eleventh Amendment protection, a logical inference is that state laws imposing duties on county commissioners likewise bring these locally elected representatives within the amendment's ambit.  This is a result starkly in opposition to the line of precedent holding that local governments are not entitled to sovereign immunity under the Eleventh Amendment.  See Mt. Healthy, 429 U.S. at 280; Lincoln County v. Luning, 133 U.S. 529, 530 (1890).  It likewise undermines the rule that local governments may be liable under § 1983 for policies or customary practices that deprive individuals of federal rights.  Monell, 436 U.S. at 690-91.  The majority fails to reckon with this opposition between established law and its argument that the mere existence of state laws tasking sheriffs with specific duties favors Eleventh Amendment immunity.

In sum, the majority's designation of "force policy" as the function to consider in this case culminates in a fatally flawed analysis of how state law defines the defendant. Among the casualties of the majority's misguided discussion are the function-by-function approach that our law compels and the well-established notion that local governmental entities, despite being defined by state law, are independent of the state.

Neither of the infirmities of the majority's approach would arise were operation of a county jail recognized as the appropriate function to consider in this case. Rather, the question of how state law defines the sheriff in carrying out this function readily resolves itself upon consultation of statutes defining Georgia jails as county institutions. The first factor in our analysis thus strongly and unequivocally favors the conclusion that Sheriff Peterson is not, in operating a county jail, an arm of the state entitled to the protection of the Eleventh Amendment.

## II.  INDEPENDENCE FROM STATE CONTROL IN OPERATION OF COUNTY JAILS

The second factor in our Eleventh Amendment inquiry is the degree of control the state maintains over the defendant. Unlike other correctional facilities in Georgia, which are managed by a state department and overseen by a state board, jails are the exclusive domain of Georgia's scores of county sheriffs, who manage these institutions independently of virtually all state oversight. A proper

examination of county jails and sheriffs' role in running them gives no indication of state control.

Georgia's Code specifically charges each county's sheriff with the duty of taking "custody of the jail and the bodies of such persons as are confined therein, along with the warrant or cause of commitment." Ga. Code Ann. § 42-4-4(a)(1). Incident to this fundamental responsibility is the sheriff's obligation to "furnish persons confined in the jail with medical aid, heat, and blankets," id. § 42-4-4(a)(2), as well as to commit persons to the jails of nearby counties should the local facility prove unsafe. Id. § 42-4-4(a)(3). The counties themselves build the jails operated by their sheriffs. Id. § 36-9-5(a).

In contrast, the state maintains a network of correctional facilities that exists separate and apart from jails. This state system encompasses "state correctional institutions" and "county correctional institutions,"[9] both of which are distinct from jails and receive prisoners only after they are convicted. See id. §§ 42-5-30; 42-5-53; 42-5-51; In re Prisoners Awaiting Transfer, 224 S.E.2d 905, 906 (Ga. 1976). Unlike jails, both state and county correctional institutions must answer to state authorities: their wardens serve at the pleasure of the Georgia Board of

---

[9]Georgia's Code uses the term "county correctional institutions" to refer not to correctional facilities in a generic sense but specifically to work camps that are distinct from county jails and municipal detention units. See 1973 Op. Ga. Att'y Gen. 117 (identifying "county correctional institutions" as county public works camps). Sheriff Peterson recognizes the distinction in a brief filed with this Court. See Reply Brief of Appellant, Sept. 21, 2001, at 1-2 ("County correctional institutions are entirely different facilities from county jails.").

Corrections, whose members are appointed by the governor. Ga. Code Ann. §§ 42-2-2(a), 42-5-30.[10] Moreover, such facilities operate under the "supervision and control" of the state Department of Corrections, pursuant to rules promulgated by the board. Id. §§ 42-2-5, 42-5-53(b); Wilkes County v. Arrendale, 180 S.E.2d 548, 549 (Ga. 1971). In exercising this rule-making authority, the Board of Corrections has adopted regulations governing everything from inmates' personal hygiene to the size of disciplinary isolation cells to the frequency of inspections. See Ga. Comp. R. & Regs. r. 125-2-3-.04 (hygiene); id. r. 125-3-2-.09 (disciplinary facilities); id. r. 25-3-1-.04 (inspections).

None of this regulation applies to sheriffs, a key indicator of the state of Georgia's lack of immediate control over sheriffs' exercise of custodial authority in county jails. See Ga. Code Ann. § 42-5-51(a) (stating that Department of Corrections "shall have no authority, jurisdiction, or responsibility" with respect to offenders sentenced to confinement in county jails). Although a sheriff who fails to carry out certain statutory responsibilities faces the possibility of fines for contempt or removal from office, id. § 42-4-4(c), imposition of these sanctions requires formal proceedings in courts of law. Gipson v. Bowers, 434 S.E.2d 490, 491 (Ga. 1993). Accountability to judicial enforcement establishes only that

---

[10]In the case of county correctional institutions, wardens are appointed by county governing authorities "subject to approval" of the board of corrections, and they serve "at the pleasure of the county or the board." Ga. Code Ann. § 42-5-30.

sheriffs' offices in Georgia possess legal personality, not that the state controls the sheriff for purposes of our Eleventh Amendment analysis.

Moreover, whereas the state can order county correctional institutions to take custody of prisoners, it generally lacks authority to house prisoners in county jails without the approval of the local sheriff. The chief administrative officer of the Department of Corrections "may designate as a place of confinement any available, suitable, and appropriate state or county correctional institution in this state operated under the jurisdiction or supervision of the department. . . . Neither male nor female state inmates shall be assigned to serve in any manner in a county jail unless [upon] . . . the approval of . . . the sheriff or the jail administrator of the county." Ga. Code Ann. § 42-5-51(d).[11] State court judges likewise lack authority to compel the sheriff to transfer a prisoner by way of a sua sponte determination

_____

[11]The majority identifies one exception to this categorical statutory command. Under Georgia law and in exchange for a per diem fee, sheriffs maintain temporary custody of prisoners whom the Department of Corrections is unable to transfer to state prisons due to overcrowding in these facilities. See Clayton County v. Evans, 366 S.E.2d 282, 282-83 (Ga. 1988). Yet the Department of Corrections enjoys no more authority with respect to these inmates' custody than with respect to the sheriff's custody of all other persons confined in county jails. The detailed regulations promulgated for the administration of state prisons remain wholly inoperative. Moreover, the very fact that the department must pay a per diem fee in this connection, see Ga. Code Ann. § 42-5-51(c), demonstrates that state law does not transform the sheriff maintaining such prisoners into a state agent, but rather continues to recognize jails as local entities with which the state enters into an essentially contractual relationship. Accord Clayton County, 366 S.E.2d at 283 (rejecting proposition that prisoners housed in county jail for per diem fee "were 'assigned' to serve sentences in the county's jail without the county's approval" and characterizing them instead as "merely temporarily incarcerated in the county jail, with the reimbursement provided by § 42-5- 51(c), until such time as space could be made available for their transfer to a state correctional institution"). The arrangement through which state and local authorities in Georgia cooperate for the purpose of relieving overcrowding in state prisons fails to demonstrate that the state exercises control over county sheriffs.

that a particular jail is insecure.  See In re Irvin, 328 S.E.2d 215, 218 (Ga. 1985); Howington v. Wilson, 100 S.E.2d 726, 727 (Ga. 1957).  By contrast, sheriffs themselves have the authority under certain conditions to commit persons in their custody to jails in adjoining counties.  See Ga. Code Ann. § 17-7-1.[12]

The most substantial oversight to which Georgia law subjects sheriffs involves not state but other county officers.  The chapter of the Georgia Code titled "Jails" begins with the mandate that "sheriffs are jailers of the counties and have the authority to appoint other jailers, subject to the supervision of the county governing authority."  Id. § 42-4-1(a); Griffin v. Chatham County, 261 S.E.2d 570, 571-72 (Ga. 1979) (citing predecessor provision in upholding county commission's authority to compel sheriff to accept prisoners whom county had agreed to hold in detention).  In aid of this supervisory function, county governing authorities have at their disposal the investigative powers of grand juries, see Ga. Code Ann. § 15-12-71(c), which must inspect jails annually and make appropriate recommendations to the county commission.  Id. § 15-12-78.  Notably, grand juries regularly advise county commissions with regard to "the treatment of the inmates," id. 15-12-78, as well as the jail's general "operations."  Id. § 15-12-71(b)(1).[13]  County oversight of jails in Georgia thus sweeps more broadly than in

---

[12]Complementing this authority is the obligation of sheriffs to accept prisoners from other counties upon receipt of an advance payment of fees and costs.  Ga. Code Ann. § 17-7-2.

[13]The majority characterizes the grand jury's inspection of county jails as incident to the "well-established function of grand juries in the State's justice system."  Majority Opinion at 34-

Alabama. As we explained in Turquitt, 137 F.3d at 1289, "Alabama's Constitution sends a clear message that a sheriff is a state officer, whose actions with respect to the well-being of jail inmates are most appropriately controlled by state officials," whereas Alabama counties are primarily responsible only for the jail's "physical plant." Id. at 1290. Georgia counties' broader supervisory role complements their correspondingly expansive responsibility to maintain not only the jails themselves but also the inmates in their custody. Ga. Code Ann. § 42-5-2(a). Counties are responsible not only for the health and humane treatment of jail inmates but also for certain costs bearing a more attenuated relationship to the maintenance of custody: they must defend habeas corpus actions and pay for the cost of any escape and recapture of prisoners. See id. § 42-5-2(a).

In sum, Georgia has created two different sorts of facilities for the custody of persons detained as a result of alleged or proven crimes. On the one hand is the set of facilities maintained directly by the state for the custody of most convicted felons. On the other are the jails of the state's counties, which exist primarily to hold persons awaiting trial or convicted of minor offenses. The state has integrated its own correctional institutions within a unified system subject to the control of statewide agencies, which direct the appointment and removal of

35 n.40. That general role is simply immaterial to the present case, which addresses the particular function of jail administration. As the majority acknowledges, grand juries inform county commissions about the "treatment of inmates" generally. The breadth of this advisory function coincides with counties' general responsibility for sheriffs' management of county jails.

75

wardens, supervise operations, and decide which institutions will take custody of which prisoners. By contrast, Georgia's county jails exist in relative isolation. Each is run by an independent sheriff under the supervision of a county governing authority, with no institutionalized mechanism for state oversight.[14] The sheriff may generally refuse to house state prisoners, and inasmuch as Georgia law carves out certain exceptions to this rule, it never intrudes upon the sheriffs' independent custody over all persons confined in county jails. Sheriffs exercise this undiluted authority to operate what are indubitably county institutions.

As in its application of the first Eleventh Amendment factor, the majority slights the weight of state laws vesting counties and their sheriffs with authority over jails by relying on its unorthodox definition of "force policy" as the "function" at issue in this case. Thus it characterizes Georgia counties'

_____

[14]The majority seeks to minimize the importance of sheriffs' independence from Georgia's integrated corrections system by remarking that the existence of a statewide Department of Corrections "does not preclude the State from [also] utilizing other law enforcement agencies, such as sheriffs, to perform the State's incarceration function for state offenders." Majority Opinion at 27 n.33. Be this as it may, the only reason given by the majority for regarding Sheriff Peterson as acting for the state at all, with respect to prisoners such as Willie Manders, is its pronouncement that sheriffs engage in a state function whenever they detain persons charged with felonies. Id. As discussed above, however, the operation of county jails cannot be regarded as a state function merely because the elements of felony offenses are found in state penal codes. See supra note 5. Even were this mistaken premise conceded, the relevant point with respect to the control factor would remain that county sheriffs discharge a "State[] incarceration function" independently of the only state agency with supervisory authority over state correctional facilities. Thus, the control factor would continue to militate against the extension of Eleventh Amendment immunity. The majority's elision of this point ultimately consists in the argument that because sheriffs (1) exercise independent custodial authority and (2) are state actors, their own independence – their self-control, if you will – should be considered "state control." The belabored tautology of this reasoning is less than illuminating with respect to our present inquiry.

obligations with regard to "the jail structure and . . . food, clothing, and medical necessities" as involving "wholly separate and distinct matters" from the function involved in this case. See Majority Opinion at 34. After executing this maneuver, however, the majority once again fails to cite any law by which the state does control sheriffs with respect to the "force policy" function the majority has newly defined. Instead, the majority rests its application of the control factor on the observations that sheriffs must undergo training coordinated by a statewide association of sheriffs and the governor may suspend sheriffs for up to 90 days.[15] These points cannot bear the weight assigned them.

With respect to training, the majority must rely on hypothesis to relate its discussion to "force policy" at all. Sheriffs are required to undergo twenty hours of training "generally devoted to contemporary law enforcement, investigation, judicial process, and correction practices." Ga. Code Ann. § 15-16-3(a), (e)(1).

---

[15]Apart from its argument that training requirements and the state's limited suspension power establish state control, the majority muddies its analysis by trying to establish the complementary proposition that Georgia counties have no control over the function at issue in this case. Majority Opinion at 34. Since Sheriff Peterson is himself an independent county officer under Georgia's Constitution, the only way to make sense of this assertion is to read it as premised on the county commission's lack of control over the sheriff.

As I have explained in my concurrence in Grech, ___ F.3d ___, however, the county commission is not the only institution that acts for the county. Georgia has structured its county governments to vest authority for different functions in different, coequal offices interacting in a manner akin to the federal government's separation of powers. Thus, the sheriff's independence from the county commission should be interpreted not as independence from the county, but rather as independent authority to act for the county with respect to the functions entrusted his office.

77

The lack of more specific authority notwithstanding, the majority decrees it "reasonable to assume" that this training "includes instruction on force policy and hiring and training deputies." Majority Opinion at 31-32. Reasonable or not, the control factor may be applied much more straightforwardly by observing simply that the sheriff's custodial responsibility for jails, including the treatment of inmates, is not subject to oversight from state correctional agencies.

The majority's discussion also falters because it cannot be said that sheriffs' training is in fact administered by the state. Rather, the training is overseen by the Georgia Sheriffs' Association, a private organization comprising the state's elected sheriffs. See Ga. Code Ann. § 15-16-3(e)(1); see also Georgia Sheriffs' Association, Welcome, at www.georgiasheriffs.org (last visited Jun. 11, 2003). Given the association's composition, it begs the question presently before us to characterize sheriffs' training as a state-administered program: we are sitting en banc for the very purpose of determining whether the sheriffs who design and conduct this training are themselves state or county officials.

Finally, inasmuch as the majority means to assert that the mere existence of a training requirement establishes state control, its approach again proves too much. Not only the sheriff but also holders of the quintessential local governmental office, that of county commissioner, must satisfy a training

requirement. See Ga. Code Ann. § 36-20-4 (requiring commissioners to complete 18 hours of training on matters pertaining to the administration of county governments). So too must city and county police officers, see id. §§ 35-8-9, 35-8-21, 35-8-2(8)(A) (requiring basic training course prior to service and annual training thereafter), and private lawyers. See Ga. St. Bar R. 8-104(A) (setting forth annual continuing legal education requirement for members of bar). Just as the General Assembly may define the powers and duties which attach to local office, it may require that local office-holders and licensed professionals complete courses of training. This exercise of state sovereign authority does not mean that the persons regulated are subject to state "control" such that the Eleventh Amendment should immunize them from suit. The majority fails to reckon with this anomalous implication of its reliance on sheriffs' annual training requirement in applying our second Eleventh Amendment factor.

The other component of the majority's control analysis is its discussion of the Georgia governor's power to suspend county sheriffs. While the governor indeed has the authority to suspend sheriffs by following a statutorily defined procedure, it is not clear why this power should be viewed as more decisive than the limits clearly circumscribing it. For one thing, the governor cannot act unilaterally to remove a county sheriff. See Gipson, 434 S.E.2d at 491 (stating

79

that "the Governor and the Attorney General can take no official action against a sheriff unless there has been a criminal indictment").[16]  Not only do the relevant statutes vest the governor with no removal power, they also forbid him or her from suspending a sheriff for longer than ninety days.  See Ga. Code Ann. § 15-16-26(c).  Exercise of even this limited suspension power requires the governor to appoint and receive the affirmative recommendation of an investigatory committee, see id. § 15-16-26(c), on which county sheriffs themselves constitute a majority.  Id. § 15-16-26(a).  The governor's real but limited suspension power and his lack of removal power are as readily viewed as evidence of a lack of control as of control.

In sum, the majority's flawed conception of the function at issue in this case leads it to ignore a statutory scheme clearly rendering Sheriff Peterson independent from state corrections officials in his administration of the Clinch

---

[16]The majority distinguishes Gipson as a case construing the statute that defines the governor's power to remove any and every public official, rather than the statute conferring a more specific power to temporarily suspend sheriffs.  See Majority Opinion at 33 n.38.  Yet it is undisputed that the governor has no more power to remove sheriffs than any other officials.  The majority chooses to ignore this and instead focus exclusively on suspension.  As I explain in the text, the significance which the majority assigns the governor's suspension power indicates only its need to rest an otherwise unsupported argument on inferences drawn from a law that could as easily be interpreted to the opposite effect.  While the majority seems to fault the Georgia Supreme Court for speaking too broadly when it explained in Gipson that the governor "can take no official action against a sheriff" absent criminal indictment, see Majority Opinion at 33 n.38, one might also regard the high court's unanimous agreement upon such categorical language as an indication of the conception of sheriffs held by jurists better trained than we in Georgia law.

County Jail. At the same time, the majority's discussion of "force policy" as the relevant function leads it to no comparably illuminating statutory guidance, but rather involves it in flawed or tendentious arguments based on the training program sheriffs must attend and the governor's power to order suspensions of sheriffs for up to 90 days.

### III. FUNDS

The third Eleventh Amendment factor is the source of a defendant's funding. Sheriff Peterson's operating budget is appropriated entirely by Clinch County. See Grech v. Clayton County, ___ F.3d ___, at 24-25 (citing Ga. Code Ann. §§ 36-5-22.1, 15-16-20, 45-4-7, 15-16-5; Chaffin v. Calhoun, 262 Ga. 202, 203 (1992)). The county also appropriates other funds related to the function at issue in this case, namely, the costs of building and operating jails. Ga. Code Ann. §§ 36-9-5, 42-5-2(a).

The majority recognizes that "Clinch County bears the major burden of funding Sheriff Peterson's office and the jail," Majority Opinion at 36, but it nonetheless ventures an argument that the funding factor ultimately "tilt[s]" in favor of Eleventh Amendment immunity. Id. at 38. As is true of the majority's application of the other relevant factors, it reaches this conclusion via a route that begins with its mistaken conception of the function at issue in this case. The

81

majority relies on its novel notion of a "force policy" function to set aside statutes requiring counties to pay for the jail's construction, upkeep, and operations. See Ga Code Ann. §§ 36-9-5, 36-9-8, 42-5-2. It then addresses the matter of who funds the sheriff by way of speculation that is highly removed from any positive authority.

Specifically, the majority reprises the same tendentious assumptions and inferences set forth in its application of the control factor. It points out that the state pays for twenty hours of training (which, it assumes, must encompass instruction in the use of force), as well as for any costs incurred in the investigation of sheriffs. Although this funding pertains no more to "force policy" than to any other function of the sheriff's office, the majority chooses to regard it as particularly pertinent to this case. It does not explain how funds appropriated for a training course of several days and the rare investigation of possible misconduct outweigh the counties' obligation to finance jail construction and then pay all costs of their daily operation and maintenance, year in and year out.

The majority also remarks that counties' funding obligations, including minimum salary and bond requirements, are established under state law. Majority Opinion at 36. These points are immaterial to our application of the funding factor, which addresses simply the origin of an entity's funding, not the law under

82

which funding obligations arise. See Tuveson v. Florida Governor's Council on Indian Affairs, 734 F.2d 730, 732 (11th Cir. 1984) (stating relevant question as "where funds for the entity are derived"). In implying a contrary rule, the majority's analysis again conflates the state's authority to structure local governmental entities – as by requiring each county to appropriate funds for a sheriff's office – with the sovereign immunity accorded by the Eleventh Amendment.

Moreover, Georgia courts have recognized that county commissions act autonomously in funding the sheriff's office so long as their appropriations preserve the sheriff's capacity to execute the basic functions of office. See Chaffin v. Calhoun, 415 S.E.2d 906, 908 (Ga. 1992). Review of whether this minimum standard has been satisfied is for abuse of discretion, Board of Comm'rs of Randolph County v. Wilson, 396 S.E.2d 903, 904 (Ga. 1990), and the cases amply demonstrate counties' authority to make very substantial cuts in sheriffs' funding. See Chaffin, 415 S.E.2d at 908 (upholding county commission's reduction of sheriff's budget by 47 percent); Board of Comm'rs of Randolph County, 396 S.E.2d at 904 (upholding commission's decision not to appropriate funds needed to pay deputy's salary); Lovett v. Bussell, 249 S.E.2d 86, 86 (Ga.

1978) (upholding commission's decision not to appropriate funds necessary to supplement salaries of six deputies).

Finally, the majority asserts that "Clinch County sets the total budget but cannot dictate how Sheriff Peterson spends it." Majority Opinion at 37. This argument is both inapposite and mistaken. First of all, it conflates the control and funding factors. More importantly, it obscures the only point relevant to our Eleventh Amendment analysis: whatever the extent of county commissioners' control, it is undisputed that the state exercises no control whatsoever over the sheriff's expenditures. Finally, the majority wrongly equates the "county," of which Sheriff Peterson and members of the board of commissioners are coequal officers,[17] with the board of commissioners alone. Because Sheriff Peterson is himself a county officer, it is incoherent to say the county "cannot dictate" how his budget is spent.

## IV. STATE'S LIABILITY FOR ADVERSE JUDGMENT

The final factor relevant in our analysis is the state's legal liability for a judgment against the sheriff. A showing that the state would be liable for judgment militates with particular force in favor of holding Eleventh Amendment sovereign immunity to protect the defendant from suit in federal court; a showing

---

[17]See supra note 15.

that the state would not be liable cuts strongly against such immunity. Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 430 (1997); Auer v. Robbins, 519 U.S. 452, 456 n.1 (1997) (declining to extend Eleventh Amendment immunity to police commission, 80 percent of which was appointed by state governor, because "the city of St. Louis is responsible for the board's financial liabilities" (internal citation omitted)).

Here, the majority is correct in concluding that Georgia law offers no indication that the state would be liable for a judgment against Sheriff Peterson. Majority Opinion at 43. It wrongly concludes, however, that Georgia law also unequivocally protects counties from liability for their sheriffs' actions.

The majority cites a number of cases showing that the state of Georgia has, as a general matter, granted counties immunity from suit on causes of action arising under state law. Notably, it has done so under a statutory provision that stands apart from the enactment defining the state's own immunity. Compare Ga. Code Ann. § 36-1-4 with id. § 50-21-20 et seq. Counties' immunity from many state law causes of action does not render them immune from liability under 42 U.S.C. § 1983 for violations of federal rights. Howlett v. Rose, 496 U.S. 356, 376-77 (1990) ("[S]ince the Court has held that municipal corporations and similar governmental entities are 'persons,' a state court entertaining a § 1983 action must

85

adhere to that interpretation. Municipal defenses–including an assertion of sovereign immunity–to a federal right of action are, of course, controlled by federal law.") (citations omitted); <u>Martinez v. California</u>, 444 U.S. 277, 284 & n.8 (1980) (state law granting immunity to parole officers does not control question whether such officers have immunity under § 1983).

Georgia's own courts have recognized as much.  In <u>Lowe v. Jones County</u>, 499 S.E.2d 348, 350-51 (Ga. Ct. App. 1998), the court reached the merits of a claim that a sheriff's training policies had violated the federal constitutional rights of the plaintiff's decedent.  The plaintiff had named the sheriff and the county as defendants.  <u>Id.</u> at 349.  Thus, simply by reaching the merits, the court treated a § 1983 suit against a county sheriff as not implicating the threshold immunity from suit to which state instrumentalities are entitled under the Eleventh Amendment. The court also stated explicitly that "local governments may be liable" for certain violations of federal rights, thereby conveying the view that a suit arising out of a sheriff's policies implicates the liability of the county, not the state.  <u>Id.</u> at 350.

Also favoring the conclusion that Clinch County would satisfy a § 1983 judgment against Sheriff Peterson is the authority of county commissions to pay attorney fees incurred by sheriffs in defending civil rights actions in federal court. <u>See</u> <u>Haywood v. Hughes</u>, 235 S.E.2d 2, 3 (Ga. 1977).  While the majority is

correct in pointing out that counties are not required to take this step, no county would have any incentive to defend actions against sheriffs were it true that a judgment would be the responsibility of the state.

While a defendant may be entitled to Eleventh Amendment immunity even when an adverse judgment will not implicate the state's treasury, Regents of the Univ. of Cal., 519 U.S. at 431, liability for judgment remains the single most important factor in our analysis. Hess, 513 U.S. at 48-49 (identifying "prevention of federal-court judgments that must be paid out of a State's treasury" as the "impetus for the Eleventh Amendment," and citing with approval seven court of appeals decisions recognizing "vulnerability of the State's purse as the most salient factor in Eleventh Amendment determinations"). Thus, when the state bears no liability for a defendant's actions, this fact militates with particular force against allowing the defendant to invoke the Eleventh Amendment. For this reason, the authority indicating that Georgia incurs no liability in connection with judgments against county sheriffs simply cannot be ignored.[18] As with the rest of the state law we have examined in this case, the state's non-liability for any

---

[18]The majority seeks to mitigate the force of the state's non-liability by speaking in broad terms of the potential for judgments against sheriffs to "interfere with a state program or function." Majority Opinion at 47. This argument begs the question. In drawing a connection between sheriffs and "a state program," the majority presumes the very point it has failed to establish in its application of our first three Eleventh Amendment factors.

judgment against Sheriff Peterson demands that we allow Manders's suit to proceed.

## CONCLUSION

In this case, each of the factors we normally apply to determine whether a defendant is entitled to Eleventh Amendment immunity weighs against extending such protection to Sheriff Peterson. Georgia law clearly defines Sheriff Peterson as a county officer and jails as county institutions; the state's corrections authorities exercise no control over Sheriff Peterson in his operation of the county jail; Clinch County appropriates Sheriff Peterson's operating budget and pays for the jail's construction and upkeep; and there is no indication that a judgment against Sheriff Peterson would operate against the state of Georgia.

By inventing a previously unknown function as the purported focus of its analysis, the majority trades the clarity to be found in the Georgia law of county jails for a blur of inference and speculation. The upshot is a substantial blow to established law assuring citizens' ability to hold local governments accountable for violations of the United States Constitution. See Jinks, 123 S. Ct. at 1673; Monell, 436 U.S. at 690-91. A correct reading of Georgia law shows that county sheriffs operate county jails for the counties in which they serve. In every sense, a suit under 42 U.S.C. § 1983 against a county sheriff alleging mistreatment in a

county jail is a suit against a local government. The Eleventh Amendment, which protects states, is inapplicable, and the decision of the district court should therefore be affirmed.

For the foregoing reasons, I dissent.